**In re SHARON STEEL CORPORATION, Debtor.**

**Appeal of DWG CORPORATION and Victor Posner.**

**No. 88–3651.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) March 30, 1989.

Decided April 7, 1989.

**1218**

Paul H. Titus, Mansmann, Cindrich & Titus, Pittsburgh, Pa., Michael V. Blumenthal, Haythe & Curley, New York City, for appellants.

Russell J. Ober, Jr., Steven Petrikis, Rose, Schmidt, Hasley & DiSalle, Pittsburgh, Pa., for appellee James W. Toren, trustee of Sharon Steel Corp.

Herbert P. Minkel, Jr., Vincent J. Coyle, Jr., Fried, Frank, Harris, Shriver & Jacobson, New York City, Philip E. Beard, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, Pa., for appellees, The Official Committee of Unsecured Creditors.

Before GIBBONS, Chief Judge, and SCIRICA and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Chief Judge:

DWG Corporation and Victor Posner appeal from a district court decision affirming a bankruptcy court order appointing a trustee-in-bankruptcy for debtor Sharon Steel ("the debtor" or "Sharon") pursuant to 11 U.S.C. § 1104. DWG and Posner contend that the bankruptcy court should have denied the committee of unsecured creditors' ("the committee") petition for a trustee because the request violated contractual obligations between the committee and the debtor-in-possession.[1] In the alternative, they assert that the district court erred as a matter of law in affirming the appointment of a Chapter 11 trustee both because the postpetition corrective measures taken by the debtor's management should have defeated the petition and because the debtor's alleged acts of postpeti-

tion mismanagement fail to satisfy the clear and convincing burden of proof required for appointment of a trustee. Because no binding agreement existed to prevent the committee from petitioning for appointment of a trustee and because the bankruptcy court did not err in appointing a trustee for Sharon, we will affirm.

### I.

Sharon Steel Corporation manufactures steel in a facility located near Sharon, Pennsylvania. The Sharon facility includes two blast furnaces. By April, 1987, only one of these—number 3—was operational. Sharon's most efficient blast furnace, number 2, was shut down pending $18 million in repairs. Furthermore, furnace number 3, which was three years overdue for relining, faced imminent shutdown. On April 17, 1987, confronted with $742 million in liabilities, only $478 million in assets, and pressing creditors, Sharon filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. 11 U.S.C. §§ 1100–1174 (1982 & Supp. IV 1986).

Sharon management remained in control of the corporation's operations as debtor-in-possession. At all times relevant to this case, appellant Victor Posner served as Sharon's chairman, president, and chief executive officer. Appellant DWG, under common control with Sharon, provided financial management services to Sharon and other Posner-controlled companies. It operated out of a Miami office building owned by Posner and provided 13,000 square feet of office space to Sharon to house its executive offices, charging Sharon $24 per square foot.

Some five months after Sharon filed for reorganization, the committee, dissatisfied with the progress—or lack thereof—made by Sharon's management, petitioned the bankruptcy court for appointment of a trustee pursuant to 11 U.S.C. § 1104. On the following day, September 29, 1987, the

---

1. Posner and DWG half-heartedly contend that the trustee cannot be a party to this appeal because the stipulation allegedly entered into by the parties withdrew the trustee motion, the committee did not oppose the reconsideration motion, and the office of the United States Trustee took no position on the reconsideration motion or the district court appeal. The district court correctly dismissed this argument.

court approved an $18 million loan package to enable the debtor to reline blast furnace number 2.[2] The bankruptcy court held hearings on the committee's petition on October 15 and November 3, 1987. On that second day of hearings, the bankruptcy court informed the parties that it considered "independent management ... essential to maintain the viability of the business." App. 2119. The court, however, apparently at the committee's request, *see* App. 2119, gave the parties forty-eight hours to negotiate a stipulation providing for independent management and thus obviate the need for a trustee.

Because early negotiations seemed promising, the court extended the deadline.[3] The parties reached some sort of agreement on a stipulation, however, for they moved on to negotiate an order to enforce it. The order was to secure court approval of the stipulation and to settle "various other pending matters." App. 1559. The negotiations foundered,[4] however, and the committee requested a ruling on the trustee motion in a letter faxed to the court on January 7.

On January 11, 1988, the bankruptcy court entered an order appointing a trustee. Meanwhile, the parties renewed their negotiations. Sharon owed a $2 million installment on the relining job on January 19. Failure to pay would stop all work.

Thus, the possibility of quick access to $4.4 million owed Sharon by Posner as reimbursement for amounts spent by Sharon on Posner's defense in a personal criminal matter,[5] apparently lured the committee back to the table.[6] The two sides finally reached agreement on a loan agreement[7] between Posner and Sharon for $4.4 million and an order approving the stipulation. On January 13, they jointly requested a hearing on a motion for reconsideration of the trustee's appointment. As part of their motion, they submitted a "completed" stipulation. The parties also filed a companion motion seeking authorization of the loan agreement between Sharon, Posner, and DWG. The bankruptcy court held a hearing the following day and entered an order approving the appointment of James W. Toren as trustee, which had the effect of denying the parties' motion to approve the stipulation and vacate the order authorizing a trustee.

On January 21, Posner and DWG filed a motion to reconsider or, in the alternative, to stay the appointment pending appeal. Sharon later joined in this motion, which was opposed by the committee and the trustee. The bankruptcy court held yet another hearing and, on March 4, 1988, denied the motions to reconsider or to stay. App. 1769–70. Posner and DWG then ap-

---

2. Posner made a show of participating in this loan package. The bankruptcy court characterized Posner's role as "only a commitment by Sharon to arrange a bank loan for Sharon. Posner was committed to nothing." App. 2217. Furthermore, Posner's participation evaporated in open court on September 25. App. 2117.

3. The parties offer differing accounts regarding when and if a stipulation was executed. Because the documentation ultimately submitted to the bankruptcy court belies the existence of a binding agreement at the time the court rendered its decision, no reconciliation of the parties' accounts is required.

4. On January 4, 1988, counsel for the committee telecopied to counsel for Sharon and DWG and Posner a proposed order for signature by 9:00 a.m., January 6. App. 1237. They returned via fax a signed copy of the order late on the night of January 5. App. 1243. That order, however, contained language extending the period during which the committee could not file a plan for reorganization, App. 1247, a condition the com-

mittee claims the debtors knew was unacceptable to them. App. 1249. The committee then sent its letter to the court asking for a ruling. App. 1248–51.

5. In April 1982, Posner was criminally indicted in the United States District Court for the Southern District of New York for personal income tax evasion and conspiracy. See generally App. 192–209. The charges covered the period from 1975 to 1979. App. 195. Posner entered a plea of nolo contendere. App. 553.

6. The committee, probably doubting Sharon's, DWG's, and Posner's sincerity, refused to withdraw its request for a ruling, App. 2119, even though the parties had scheduled a meeting to approve the stipulation for January 11, the day the court issued its ruling. App. 2119, 1562. The parties finally reached an agreement on January 13. App. 2121, 1563.

7. The agreement provided that once the order became final, Posner would forgive the loan.

**1220**

pealed this last decision to the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. § 158(a) (1982 & Supp. IV 1986). The district court affirmed the denial of the stay. It also ordered the bankruptcy court to file findings of fact and conclusions of law for its January 15 order. App. 2099.

The bankruptcy court's Opinion on Appointment of a Trustee, dated May 2, 1988, 86 B.R. 455, sets forth its reasons for granting the motion for appointment of a trustee and denying the motion to vacate that order and approve the stipulation. It relied on 11 U.S.C. § 1104, which provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest ...,[8] and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mis-

management of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104 (1982 & Supp. IV 1986) (footnote added). The facts before the court, it found, satisfied both subparts. It cited numerous prepetition transfers of Sharon assets that amounted at best to voidable preferences and at worst to fraudulent conveyances, none of which had been questioned by the debtor-in-possession.[9]

---

**8.** The bankruptcy court and, indirectly, the district court mistakenly relied upon a superseded version of § 1104. In 1986, Congress amended subsection (a) to allow the United States trustee to request appointment of a trustee. *See* Bankruptcy Act of 1986, Pub.L. No. 99–554, § 222, 100 Stat. 3088, 3102 (1986). Because this amendment does not affect the outcome in this case, the error is harmless.

**9.** These either preferential transfers or fraudulent conveyances include a $3.7 million wire transfer made by Sharon to DWG on April 16, 1986 apparently in payment of a $3.58 million annual charge including $122,433.21 rent for the chairman's office, $74,465.53 for use of a yacht that Sharon owned, $170,483.26 for airplane usage (although the plane was owned by Sharon), $230,422.28 for use of the guest apartments in Miami, and $100,833.21 for accommodations in the Waldorf–Astoria; a December 1986 transfer by Sharon to NPC Leasing Company, under common control with Sharon, of title to a yacht and airplane, each minimally valued at $750,000; a March 16, 1987 transfer of 141,000 common shares in Chesapeake Financial Corporation, valued by the trustee at $24 million, to Insurance and Risk Management, also connected to Sharon by interlocking directors, in satisfaction of an antecedent debt of $1,512,493.75; and approximately $16 million in compensation paid to Victor Posner between 1983 and September 1987, including $4.4 million paid by Sharon for his defense in a criminal action for individual tax evasion and conspiracy, and approximately $1.8 in compensation paid to Stephen Posner. App. 2107–08, 2112, 2114.

In its conclusions of law, the bankruptcy court held the transfers of the $3.7 million to DWG, the yacht and plane to NPC Leasing, and the 141,000 shares of Chesapeake Financial Corporation to Insurance and Risk Management constituted prima facie voidable preferences. It also held the 1985 through March 1987 transfers of $9.8 million to Victor Posner and $940,000 to Stephen Posner "were not shown to be for an adequate consideration, and prima facia [sic] constitute fraudulent conveyances." App. 2124. The bankruptcy court also credited expert testimony that valued the Miami office space at $12.50 per square foot and noted that DWG charged Sharon $24. App. 2112.

The trustee has instituted several actions to recover various of these assets for the estate. He has sued Posner in United States district court for reimbursement of the criminal defense costs, excessive compensation paid to him, and damages caused by his mismanagement of the debtor. Civil Action No. 88–1850 (originally filed in the bankruptcy court on July 12, 1988 as Adversary No. 88–0042). The trustee also has brought two actions in the bankruptcy court: on August 19, 1988, Adversary No. 88–0052 to obtain books, records and financial information from DWG, Posner, and others; and on March 11, 1988, Adversary No. 88–0019 to recover the 141,000 shares of Chesapeake Financial Corporation stock from Insurance and Risk Management. The trustee also filed suit against Posner in the bankruptcy court on June 3, 1988 for the return of 14 original Norman Rockwell oil paintings that belonged to Sharon. Adversary No. 88–0030. In October 1988, the bankruptcy court approved without prejudice a stipulation requiring Posner to return the paintings.

Not only had Sharon failed to sue for recovery of these transfers, but the bankruptcy court questioned the current management's ability to fulfill its fiduciary duty to pursue these claims since Sharon shares common management with the recipients of the transfers, who also owe conflicting fiduciary duties to the recipients. Disclosure of the transfers did not cure the preferential or fraudulent transfers.

The bankruptcy court also faulted Sharon's day-to-day management of the estate. Sharon, which continued to rely on DWG for financial services, had not yet closed out its books for the period preceding reorganization. Thus, not only was the debtor continuing to hemorrhage money at an estimated $2 million per month at a time when steel prices were rising, but the debtor could not even measure the precise size of these losses since it had no postpetition profit and loss statements.

Similarly, the court also criticized Sharon's failure to renegotiate its $30 million working capital loan from the 28% to 30% interest rate originally agreed to to a reasonable 14% to 15%—an action that would save Sharon $4 million a year. It also impugned the wisdom (and the propriety) of Sharon's repayment during 1985 and 1986 of $294 million in secured bank loans "in order to facilitate new loans from those banks to other Posner companies." App. 2113. Given Sharon's blast furnace crisis and the fact that the payments left Sharon so cash-poor that it was forced to enter into the $30 million, high-interest working capital loan, it concluded such actions amounted to gross mismanagement. *Id.*

Last, the bankruptcy court raised an even more fundamental issue when it questioned the $279,872.50 in attorneys' fees expended during the last quarter of 1987 to fight the appointment of the trustee:

> While the equity owners are entitled to representation and to assert their rights, one must speculate whether the expenditure of such resources was appropriate, and whether Sharon's counsel in doing so was fulfilling its fiduciary duty to the debtor's estate, or was defending the private position of the equity owners. The funds expended come from the estate, and in view of the admitted insolvency, will likely be borne chiefly by creditors.

App. 2118. The bankruptcy court determined that the sum of the above behavior amounted to cause under section 1104(a)(1). It also demonstrated the necessity of new management just to keep Sharon operating, therefore implicating the interests of the creditors and equity holders alike specified for appointment of a trustee under subsection (b).

Because the bankruptcy court wrote its opinion long after its involvement in the events ended, it also incorporated into its opinion its reasons for denying the parties' subsequent motions. With regard to the stipulation, it found that the parties had not reached an agreement prior to the court's January 11 decision. As support, it recited the history of the stipulation. Originally the court at the committee's request had given the parties forty-eight hours to negotiate a settlement to the trustee dispute. Early signs of progress resulted in an extension that lasted until early January. On January 7, 1988, the committee through its attorney informed the court that negotiations had reached an end and that the committee wished a ruling on its motion. The same day, Posner and DWG also filed a motion to enforce the stipulation dated November 25, 1987 [10] as an enforceable agreement. On January 8, 1988, a telephonic conference held between the court and counsel for the debtor and for the committee revealed continuing negotiations. The committee, however, stated that it still desired a ruling on the motion.

After reviewing the case before him, the bankruptcy judge concluded that stipulation was incomplete and therefore unenforceable. He found that it had not been executed as to all of its provisions and was contingent upon court approval, which required notice and a hearing. In addition, the parties envisioned that the order would contain additional terms. Furthermore, the stipulation's provision obligating Posner to

---

**10.** Sharon and Posner and DWG refer to this as the November 4 stipulation.

reimburse Sharon for the $4.4 million in defense costs specified court approval by December 31, 1987 to be effective—a date that had come and gone. Thus, it had elapsed. Without a stipulation, the Sharon situation had not changed since the hearing, and thus the judge held that section 1104 required him to appoint a trustee.

Regarding the motion to approve the stipulation and order and vacate the trustee appointment, the court noted that at the hearing the parties argued that Sharon had been managed independently since November by Walter Sieckman, hired as chief operating officer in October. They pressed for urgent action by the bankruptcy court because the relining would stop if payment of the $2 million were not made on time. The court found this to be another manifestation of mismanagement that supported, rather than challenged, its appointment of a trustee. The bankruptcy court, citing Bankruptcy Rules 9023–24,[11] concluded that none of the facts presented by the parties antedated the January 11 order and therefore did not manifest substantial cause to upset that order. It also noted that a reversal at this point would further shake public confidence in Sharon's reorganization.

The district court affirmed the bankruptcy court's decision to appoint a trustee in a brief decision dated September 15, 1988. Apparently applying a clearly erroneous standard to the bankruptcy court's decision, the district court concluded that the evidence before the court pointing to pre- and postpetition mismanagement was clear and convincing. As to the stipulation, it upheld the ruling that no stipulation existed on January 11, 1988. It agreed that approval of the stipulation in the instant case would have resulted in more harm than good. Thus, the bankruptcy judge had not abused his discretion in refusing to vacate the order appointing the trustee. See generally App. 2129–30. This appeal followed.

## II.

The parties to this appeal dispute the proper standard of review to be applied in this case. At the outset, it should be noted that this court's review of the district court effectively amounts to review of the bankruptcy court's opinion in the first instance. *See Ram Constr. Co., Inc. v. American States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir.1984) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir.1981)). Beyond this basic premise, it is settled law that this court applies a clearly erroneous standard to findings of fact, conducts plenary review of conclusions of law, and must break down mixed questions of law and fact, applying the appropriate standard to each component. *See, e.g., Resyn Corp. v. United States*, 851 F.2d 660, 664 (3d Cir.1988); *In re Jersey City Medical Center*, 817 F.2d 1055, 1059 (3d Cir.1987); *Ram Constr. Co., Inc.*, 749 F.2d at 1052–53; *Universal Minerals, Inc.*, 669 F.2d at 101–02. The district court reviewed the bankruptcy court's decision to appoint a trustee using a clearly erroneous standard. The committee and the trustee have embraced this standard. In contrast, Posner and DWG argue that the district court should have conducted a plenary review. They accurately define the problem as one of characterization; what they see as questions of law, the committee and the trustee perceive as questions of fact.

This court discussed at length the proper standard of review of issues containing mixed questions of fact and law and how to separate the two in *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102–03 (3d Cir.1981). *Universal Minerals*, also a bankruptcy proceeding, arose from a determination by the bankruptcy court that C.A. Hughes had abandoned certain personal property. The district court, substituting its own findings of fact for those of the bankruptcy court, reversed. Holding that the bankruptcy court's inference of intent to abandon from the facts presented was not clearly erroneous, this court reversed the district court.

To reach this conclusion, *Universal* reiterates the well-settled rule that this court

11. These rules make Fed.R.Civ.P. 59 and 60 generally applicable to bankruptcy cases.

applies a clearly erroneous standard to findings of fact, but conducts plenary review of legal conclusions. *Id.* The opinion then distinguishes between three different types of facts. "Basic facts are the historical and narrative events" presented for the court's consideration. *Id.* at 102. "Inferred factual conclusions are drawn from basic facts and are permitted only when, and to the extent that, logic and human experience indicate a probability that certain consequences can and do follow from the basic facts. No legal precept is implicated...." *Id.* (citation omitted). Therefore, courts apply a clearly erroneous standard to findings of basic and inferred facts. *Id.*

■ In contrast, an ultimate fact is "a legal concept with a factual component," *id.* at 103, and "is usually expressed in the language of a standard enunciated by case-law rule or by statute, *e.g.*, an actor's conduct was negligent; the injury occurred in the course of employment; the rate is reasonable," *id.* at 102 (quoting *Smith v. Harris*, 644 F.2d 985, 990 n. 1 (3d Cir.1981) (Aldisert, J., concurring)). When reviewing an ultimate finding, this court "must accept the trial court's findings of historical or narrative facts unless they are clearly erroneous, but [it] must exercise a plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Id.* at 103 (footnote omitted).

## III.

Posner and DWG correctly assert that the committee and the trustee mischaracterize the bankruptcy court's conclusion that no binding stipulation existed as a factual question. To the extent that the bankruptcy court made any findings concerning whether, for example, certain events had occurred or certain actions were taken, it made findings of basic facts. These findings must be reviewed under a clearly erroneous standard. The same standard would govern review of any factual inferences drawn from these facts. Whether the stipulation presented to the court prior to its decision to appoint the

trustee was binding upon the parties, however, clearly presents a question of law: it requires the court to determine whether the sum of the facts presented to the court as a matter of law resulted in a stipulation that bound the parties.

In *Ram Construction Co., Inc. v. American States Insurance Co.*, 749 F.2d 1049 (3d Cir.1984), this court held that contract construction, as distinguished from interpretation, is a matter of law subject to plenary review. In *Ram*, the district court had applied a clearly erroneous standard to a bankruptcy court determination that an agreement to perform a large amount of work on a round-the-clock basis constituted a new contract, rather than an agreement to perform additional work under the terms of an existing contract. While affirming the district court's result, we corrected its mischaracterization of the question before the bankruptcy court as one of interpretation, rather than one of construction.

*Ram* defines construction as " 'a process by which legal consequences are made to follow from the terms of the contract and its more or less immediate context, and from a legal policy or policies that are applicable to the situation.' " *Id.* at 1053 (quoting Patterson, *The Interpretation and Construction of Contracts*, 64 Colum. L.Rev. 833, 835 (1964)). Because the issue in question did not involve a dispute over material facts, it implicated legal questions and therefore required plenary review. *Id.*

As noted above, the parties, with the bankruptcy court's permission, entered into settlement negotiations to avert appointment of a trustee. Some two months later, the court received two very different communications from the adverse parties. On January 7, 1988, the committee submitted its request that the court rule on its motion for appointment of a trustee, stating that negotiations had ended without agreement. On the same day, both Sharon and Posner and DWG filed motions to enforce a stipulation they claimed the parties executed in November. In effect, the motions were counterresponsive.

The stipulation submitted in support of Sharon's motion was in such a shambles

that the bankruptcy court properly rejected it as nonbinding. *See* App. 1257–64 (Sharon's motion; DWG and Posner's motion does not even append a copy of the stipulation). It contains nineteen paragraphs, covering management control issues, (paragraphs 1–6, 12), reimbursement by Posner of the $4.4 million expended in his defense, (paragraph 13), a loan from DWG of another $600,000, (paragraph 14), proper record-keeping by DWG, (paragraphs 9–10), and resolution of numerous actual or potential committee-debtor disputes, (see generally paragraphs 15–17), including those over Sharon's choice of legal counsel, (paragraph 8), and an extension of Sharon's exclusivity period, (paragraph 7). The stipulation also contains a provision requiring the committee to withdraw its motion for appointment of a trustee, (paragraph 11), and another provision making its effectiveness dependent upon court approval, (paragraph 18). Last, paragraph 19 conditions effectiveness of the stipulation upon agreement on the outside directors by November 11, 1988 (see also stipulation paragraph 3).

The stipulation is undated, despite Sharon's and DWG and Posner's references to it as the November 4, 1987 stipulation. Paragraph 3 contains four blank lines awaiting entry of the names of the outside directors.[12] Paragraph 13 binds Posner to return the $4.4 million only if the court approves the stipulation on or before December 31, 1987. The document is signed by the committee's cochairmen, who expressly limit their agreement to "Sections 9, 10, 14, 15 and 16 only." App. 1264. Thus, the committee agreed only to the provisions governing DWG's role as financial manager, an obligation for all parties to meet to negotiate settlement of all disputes, and a continued right to go to court to enforce the stipulation in the event of a default. Its failure to agree to the $4.4 million payback is conspicuous. Posner, on the other hand, agreed only to the payback sections. App. 1265 (sections 13 and 16, only in so far as Section 16 shall relate to Section 13).

■ The bankruptcy court, when confronted with this document in the context of the committee's assertions that negotiations had broken down, properly concluded that no agreement existed. No other explanation exists for an alleged binding contract that includes so many elapsed conditions and unexecuted provisions. Clearly it represents an agreement under negotiation.[13]

Posner and DWG assert that the January 5 letter indicating agreement on the directors, *see supra* note 9, represents a waiver by the committee of the November 11 requirement. We cannot say the bankruptcy court clearly erred by rejecting the agreement. It reasonably could conclude that that agreement represented one more facet of the negotiations that ultimately had collapsed. Furthermore, even were this stipulation binding, it could bind the committee only to the agreed-upon provisions. These did not include the promise not to seek appointment of a trustee, the

---

**12.** A letter dated January 5, 1988 from Paul H. Titus, counsel for Posner and DWG, to Philip Beard, counsel for the committee, indicates that agreement on the four outside directors occurred long after the November 11, 1987 deadline. App. 1243 ("this will also confirm that we have agreed that the four outside Directors will be Matthew S. Metcalfe, John Kirkwood, Eugene Frank and Ronald Davenport.").

Posner and DWG incorporated this letter as an exhibit to their motion to enforce the stipulation, claiming it showed the committee had waived the November 11 deadline.

**13.** After the bankruptcy court appointed the trustee, the parties finally *did* reach agreement on the stipulation and order. When the parties moved for approval of the stipulation and vacation of the trustee order, they submitted a "completed" stipulation that is identical to the stipu-

lation submitted in early January by Sharon except that the names of the four outside directors have been entered. This fact should not be used to challenge the bankruptcy court's decision. The court had to base its decision on the record before it. That the parties should have chosen to agree to the identical stipulation later cannot be considered in reviewing the court's ruling.

Furthermore, the parties' submission of the virtually identical stipulation, many of whose provisions had elapsed and whose acceptance was limited, reflects inexcusably bad lawyering. Although the order compensates for some of the elapsed conditions, the stipulation remains the sloppy and confusing document it was in January.

crux of DWG and Posner's claims regarding the stipulation.

Posner and DWG challenge the bankruptcy court's statement that the stipulation's enforceability was defeated by its incompleteness, caused in part by the provision requiring court approval to render it effective. They argue that the absence of the court order does not free the parties of their obligations under the agreement. For support, they rely heavily on *In re Lamarre*, 34 B.R. 264 (Bankr.D.Me.1983). In *Lamarre*, a city tried to rescind its contract to buy a debtor-in-bankruptcy's property so that it might condemn the property instead. When sued for breach of contract, the city asserted that Lamarre's acceptance failed because he had conditioned it upon bankruptcy court approval. The *Lamarre* court held that an acceptance containing an implied-in-law condition does not nullify the acceptance. A principle often applied in cases involving contracts for the sale of real property is that an acceptance containing an implied-in-law condition does not defeat the acceptance. *See, e.g., Townsend v. Stick*, 158 F.2d 142 (4th Cir. 1946) (inclusion in offeree's acceptance of condition that title to real property be examined for marketability did not render acceptance conditional since marketability requirement is implied in law); *O'Halloran v. Oechslie*, 402 A.2d 67 (Me.1979) (acceptance made contingent upon obtaining financing not conditional since this condition implied in the offer).

By analogy, Posner and DWG contend that the stipulation binds the committee here because bankruptcy court approval is implied at law, and the parties, by expressly including such a condition in their contract did not render it conditional. Accordingly, they maintain, the committee is bound contractually to refrain from seeking appointment of the trustee.

The *Lamarre* rule, however, has a limited application: it tempers the common law rule that an acceptance containing new or different terms rejects the underlying offer. It has no applicability here where the question the court addresses is the existence of an underlying offer. The stipulation bears no indication of acceptance, either of the allegedly conditional provision, or of the trustee provision.

DWG and Posner also cite *Lamarre* to support their contention that failure to agree on the order by the deadline unilaterally set by the committee could not defeat the underlying contractual obligations. In *Lamarre*, the court held that time was not of the essence. *Lamarre*, 34 B.R. at 266. In addition to the fact that no contract was formed here, the instant facts are distinguishable from *Lamarre's* because there the court found that the delay had not diminished the benefits of the city's bargain. That cannot be said of the instant case, where additional delay endangered Sharon's ability to reorganize.

## IV.

■ As with its appeal of the bankruptcy court's refusal to enforce the stipulation, Posner and DWG assert that the proper standard under which to review the bankruptcy court's decision to appoint a trustee is a plenary one. Once again, the trustee and the committee argue for a clearly erroneous standard. While support clearly exists for their position, *see In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir.1988); *In re Brown*, 31 B.R. 583, 584–85 (D.D.C.1983); *In re Garland Corp.*, 6 B.R. 456, 460–61 (Bankr. 1st Cir. 1980), we agree with Posner and DWG that such a standard is inappropriate. We do not agree with Posner an DWG, however, that we exercise plenary review over appointment of a trustee. Instead, we join the Fourth Circuit in adopting an abuse of discretion standard. *See Committee of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 242 (4th Cir.1987). Such a standard best comports with the language, structure, and purpose of section 1104(a).

■ It is settled that appointment of a trustee should be the exception, rather than the rule. *E.g., In re McCorhill Publishing, Inc.*, 73 B.R. 1013, 1016–17 (Bankr. S.D.N.Y.1987) (citing 11 U.S.C. § 1108 (1982 & Supp. IV 1986)); *In re General Oil Distribs., Inc.*, 42 B.R. 402, 408 (Bankr.E.

D.N.Y.1984); *In re Main Line Motors*, 9 B.R. 782, 784 (Bankr.E.D.Pa.1981); *see* 11 U.S.C. § 1108 (1982 & Supp. IV 1986); H.R. Rep. No. 595, 95th Cong., 1st Sess. 233 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6192 ("[V]ery often the creditors will be benefitted by continuation of the debtor-in-possession, both because the expense of a trustee will not be required, and the debtor, who is familiar with his business, will be better able to operate it during the reorganization case."). While 11 U.S.C. § 1104(a) mandates appointment of a trustee when the bankruptcy court finds cause—seemingly requiring plenary review, "a determination of cause … is within the discretion of the court," *Committee of Dalkon Shield Claimants*, 828 F.2d at 242.

Subsection (a)(2) also creates a flexible standard, instructing the court to appoint a trustee when doing so addresses "the interests of the creditors, equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2) (1982 & Supp. IV 1986); *see, e.g., Committee of Dalkon Shield Claimants*, 828 F.2d at 242; *In re Parker Grande Dev., Inc.*, 64 B.R. 557, 561 (Bankr. S.D.Ind.1986); *In re Russell*, 60 B.R. 42, 45 (Bankr.W.D.Ark.1985); *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 160 (Bankr.D. Me.1982). Subsection (a)(2) allows appointment of a trustee even when no "cause" exists. 5 L.P. King, Collier on Bankruptcy ¶ 1104.01, at 1104–20 (15th ed. 1988) (citing 124 Cong.Rec. H11,102 (daily ed. Sept. 28, 1978); S17,419 (daily ed. Oct. 6, 1978)). Because subsection (a)(2) envisions a flexible standard, an abuse of discretion standard offers the most appropriate type of review for this subsection as well.

For the reasons already discussed, section 1104(a) decisions must be made on a case-by-case basis. Subsection (a)(1) requires the bankruptcy court, upon motion, to appoint a trustee when the movant has proved "cause," which the statute defines to include incompetence and gross mismanagement. Subsection (a)(2) emphasizes the court's discretion, allowing it to appoint a trustee when to do so would serve the parties' and estate's interests.

The movant, in this case the committee, must prove the need for a trustee by clear and convincing evidence. *E.g., In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 984 (Bankr.E.D.Pa.1988); *In re Paolino*, 53 B.R. 399, 401 (Bankr.E.D.Pa.1985), *aff'd*, 60 B.R. 828 (E.D.Pa.1986); *In re General Oil Distribs., Inc.*, 42 B.R. 402, 408 (Bankr.E. D.N.Y.1984); 5 L.P. King, Collier on Bankruptcy ¶ 1104.01, at 1104–20 (15th ed. 1988). The bankruptcy court found that the committee satisfied its burden under both subsections, and we cannot say that it abused its discretion in so concluding.

The bankruptcy court opinion conveys the image of a titanic industrial vessel foundering on the shoals of bankruptcy, steered there by at best careless management practices. These practices include payment of $294 million to secured creditors and $9.8 million and $970,000 without consideration to Victor and Stephen Posner respectively during a period when Sharon was so cash-poor that it could not afford to reline the vital number 2 blast furnace—so cash-poor that to continue operations on a daily basis it borrowed $30 million at 28% to 30% interest.

Other questionable management actions cited by the court include the petition-eve payment of $3.7 million to DWG, transfer of Sharon's yacht and plane to NPC, and transfer of the 141,000 shares of Chesapeake Financial Corporation stock to Insurance and Risk Management. At no time did Sharon's postpetition management try to recover any part of these transfers (or any part of the sums paid to Victor and Stephen Posner).

DWG and Posner claim that the court's November 1988 authorization for the committee to sue for recovery of these transfers cures its failure and eliminates any management conflicts of interest, rendering the court's determination erroneous. In fact, they claim that all of the alleged prepetition incidents of gross mismanagement have been corrected, forcing the court to rely on postpetition mismanagement, which they claim falls short of providing clear and convincing proof that a trustee is required. Specifically, they point

to the appointment of Walter Sieckman as chief operating officer, and the court-acknowledged management improvements he had wrought since coming aboard. They also claim that Sharon's by-laws, in compliance with Pennsylvania law, authorized payment of Posner's $4.4 million in legal fees. According to Posner and DWG, these factors make the court's reliance upon the prepetition management problems improper. *But see,* 5 L.P. King, Collier on Bankruptcy, ¶ 1104.01, at 1104–20 (15th ed. 1988) (current management must be free from previous management's taint).

For support, they rely on three cases [14] that they contend stand for the proposition that appointment of a trustee is inappropriate where prepetition gross mismanagement has been corrected and no postpetition gross mismanagement has occurred: *In re General Oil Distributors, Inc.,* 42 B.R. 402 (Bankr.E.D.N.Y.1984), *In re Crescent Beach Inn, Inc.,* 22 B.R. 155 (Bankr. D.Me.1982), and *In re Concord Coal Corp.,* 11 B.R. 552 (Bankr.S.D.W.Va.1981). This argument, however, fails for two reasons.

First, each of these cases is distinguishable. For example, *General Oil* involves questionable prepetition conduct by the two brothers serving as officers, directors, and principle shareholders, including borrowing from the already insolvent debtor, receiving bonuses, and personal use of debtor-owned luxury cars. One of the brothers had remained at the debtor's helm. The court, however, concluded that while the brothers' behavior approached gross mismanagement, on balance, appointment of a trustee would cause more harm than good. The court was influenced by the fact that the motion came late in the bankruptcy, after the debtor had turned the corner. It also considered that the plea came from a creditor that had been an active member of the creditors' committee from the commit-tee's inception and that that committee, with court approval, had hired a manager, which had performed the same function that a trustee would have performed. The committee had dismissed the manager after the basics of the reorganization plan had been set and the debtor had begun to show a profit. The court refused, under these circumstances, to appoint a trustee where no signs of postpetition mismanagement appeared.

In *In re Crescent Beach Inn, Inc.,* 22 B.R. 155 (Bankr.D.Me.1982), the court found simple mismanagement, resulting primarily from lack of sophistication, insufficient to satisfy the gross mismanagement standard of section 1104(a)(1), particularly in the absence of postpetition mismanagement. Last, in *In re Concord Coal Corp.,* 11 B.R. 552 (Bankr.S.D.W.Va.1981), the court did not detail the fraud and dishonesty attributed to current management. Instead, it relied on subsection (a)(2) to appoint a trustee, finding questionable current management's commitment to rehabilitation and its ability to maintain the confidence of creditors and lenders. Thus, its conclusion that Congress did not intend "that massive fraud by former management would ... automatically require ... a trustee where corrective action had already been initiated by the debtor," *id.* at 553, is dictum.

These cases present very different scenarios than does the case at hand. Unlike *Crescent Beach,* management here is extremely sophisticated. This sophistication colors interpretation of their actions. While DWG and Posner cite other case law holding that business dealings between a debtor and its subsidiaries or related entities does not per se create a conflict of interests, *In re F.A. Potts & Co.,* 20 B.R. 3, 4 (Bankr.E.D.Pa.1981); *In re Tyler,* 18 B.R. 574, 578 (Bankr.S.D.Fla.1981). *But see In re L.S. Good & Co.,* 8 B.R. 312, 315

---

14. The committee and the trustee cite at least as many cases maintaining that prepetition dealings with subsidiaries alone may suffice to require appointment of a trustee. *See, e.g., In re McCorhill Publishing, Inc.,* 73 B.R. 1013, 1017 (Bankr.S.D.N.Y.1987); *In re Humphreys Pest Control Franchises, Inc.,* 40 B.R. 174, 176–77 (Bankr.E.D.Pa.1984); *In re Main Line Motors, Inc.,* 9 B.R. 782, 784 (Bankr.E.D.Pa.1981); *see also In re L.S. Good & Co.,* 8 B.R. 312, 315 (Bankr.N.D.W.Va.1980) (over $1 million in intercompany transactions resulted in conflict of interests between current management and creditors requiring appointment of trustee).

(Bankr.N.D.W.Va.1980) (holding that although no clear proof of fraud, dishonesty, or gross mismanagement had been presented, intercompany transactions exceeding $1 million justified appointment of trustee under § 1104(a)(2) because size and number of transactions "places current management ... in a position of having grave potential conflicts of interest and the presumption arises that the current management ... will be unable to make the impartial investigations and decisions demanded"), they ignore the presence of "something more" in this case.

Unlike *General Oil*, Sharon's management appears to have engaged on the eve of bankruptcy in a systematic syphoning of Sharon's assets to other companies under common control. Despite DWG and Posner's contention to the contrary, such behavior raises grave questions about current management's ability to fulfill its fiduciary duty as debtor-in-possession to Sharon's creditors. Judicial intervention enabling the committee to sue for recovery of per se voidable preferences and fraudulent conveyances may have solved that isolated management problem, but it has not cleared up the question about current management's fitness to continue running Sharon Steel and its commitment to see it through to a successful reorganization. *See In re Concord Coal Corp.*, 11 B.R. 552 (Bankr.S.D.W.Va.1981) (trustee appointed under 11 U.S.C. § 1104(a)(2) on grounds that debtor's many competing business interests rendered questionable his commitment to rehabilitation and that debtor could not secure and maintain lenders' and creditors' trust).

Second, DWG and Posner's reliance on these cases presumes plenary review, when in fact our review looks only for an abuse of discretion by the bankruptcy court. This reduces still further the persuasiveness of the cited case law, which never was binding on this court anyway.

Believing that they had cleared the prepetition gross mismanagement determinations, Posner and DWG hoped to sail past the trustee appointment by arguing that the court's remaining determinations of postpetition gross mismanagement do not satisfy the heavy burden of proof imposed on the movants. The court concluded that current management's failure to negotiate a reduction in the interest rate on the $30 million operating loan, to obtain up-to-date, comprehensive postpetition financial statements from DWG, and to cut or eliminate the estimated $2 million lost monthly despite the protection of the bankruptcy laws satisfied both subsections of section 1104(a). Furthermore, it held "[t]he ongoing problem of fair allocation of costs of the Miami offices among Sharon and other Posner-owned businesses is exacerbated by the conflicts of interest, and only an independent trustee can make a proper investigation and determination of the best interests of Sharon." App. 2126.

Once again, we cannot say that the bankruptcy court abused its discretion. Under the discretionary determination of cause required by 11 U.S.C. § 1104(a)(1) and the flexible standard embodied in (a)(2), the court acted within its discretion in concluding that the totality of the circumstances signaled the need for a trustee. Despite improvements instituted by Walter Sieckman, too many major problems remained—problems symptomatic of potential bankruptcy despite the calm harbor provided by Chapter 11. Failure to force closure of the prepetition books and production of current financial statements nine months after filing,[15] combined with continued losses exacerbated by the failure to cut a major expense like the approximately $4 million in added interest on the operating loan, signaled the court that as captain, the debtor-

---

15. The trustee and the committee also cite a number of cases maintaining that inaccurate, incomplete recordkeeping alone amounts to cause requiring appointment of a trustee under 11 U.S.C. § 1104(a)(1). *E.g., In re McCorhill Publishing, Inc.*, 73 B.R. 1013, 1017 (Bankr.S.D. N.Y.1987); *In re Colby Constr. Co.*, 51 B.R. 113, 117 (Bankr.S.D.N.Y.1985); *In re Humphreys Pest Control Franchise, Inc.*, 40 B.R. 174, 177 (Bankr. E.D.Pa.1984); *In re Main Line Motors, Inc.*, 9 B.R. 782, 784 (Bankr.E.D.Pa.1981); *In re Hotel Assocs., Inc.*, 3 B.R. 343, 345–46 (Bankr.E.D.Pa. 1980).

in-possession had continued to steer Sharon toward bankruptcy rather than to turn her about toward solvency.[16] Corrective measures that are too few too late cannot defeat a change in command. The bankruptcy court's opinion clearly indicates it felt appointment necessary to save Sharon from bankruptcy. We agree.

## V.

We conclude that the bankruptcy court did not abuse its discretion by appointing a trustee. Therefore, we will affirm the judgment of the district court. Thus, we need not address whether the stipulation should be approved. In addition, the trustee's motion to strike portions of DWG and Posner's appendix and brief will be denied.

SCIRICA, COWEN and NYGAARD, Circuit Judges.

16. Once again, the committee and the trustee supply precedents where other courts have found a combination of factors—most often unsatisfactory financial records and conflicts of interest-constitute § 1104(a)(1) cause. *See, e.g., In re John Peterson Motors, Inc.,* 47 B.R. 551, 553 (Bankr.D.Minn.1985) (under 11 U.S.C. § 151104(a), identical in language to § 1104 and now repealed, court found cause including fraud or dishonesty, bad books, and pre- and postpetition losses); *In re Horn & Hardart Baking Co.,* 22 B.R. 668, 670–71 (Bankr.E.D.Pa.1982) (incomplete records and continued losses); *In re La Sherene, Inc.,* 3 B.R. 169, 175 (Bankr.N.D. Ga.1980) (facts giving rise to finding of "cause" included absence of financial controls and planning, no general management, commingling of affairs of debtor with those of related entity). The trustee examines *La Sherene* extensively, advancing it as a clear parallel to the instant facts. Because our abuse of discretion standard must emphasize the facts before us, thus limiting the precedential value of such cases, we need not enter into a detailed discussion of that case.