**In re V. SAVINO OIL & HEATING CO., INC., Debtor.**

**Bankruptcy No. 187–72500–353.**

United States Bankruptcy Court, E.D. New York.

April 28, 1989.

See also, Bkrtcy., 91 B.R. 655.

---

**1.** Section 101(40) has been renumbered to § 101(50).

**520**

■■■■■■■■■■■■■■■■■

Abraham Backenroth, Harvis & Zeichner, New York City, for Creditors' Committee.

Louis P. Rosenberg, Rosenberg, Rosenberg & Koral, Brooklyn, N.Y., for debtor.

Stewart Newmark, Taylor, Newmark & Rosenberg, New York City, for Vincent A. Savino and G. Thomas Meier.

Lateef Mtima, Coudert Bros., New York City, for Bayside Fuel Oil Depot Corp.

Seth Shapiro, Zalkin, Rodin & Goodman, New York City, for Chemical Bank.

Howard R. Goldman, Brooklyn, for V. Savino Oil Co., Inc. and Vincent J. Savino.

### DECISION ON MOTION FOR APPOINTMENT OF REORGANIZATION TRUSTEE

JEROME FELLER, Bankruptcy Judge.

Before the Court is a motion of the Creditors'. Committee requesting the appointment of a Chapter 11 trustee pursuant to 11 U.S.C. § 1104(a). Section 1104(a) provides for appointment of a trustee for cause, including fraud, dishonesty, incompetence or gross mismanagement, or if such appointment is in the interests of the parties. The motion is vigorously opposed by the Debtor. Evidentiary hearings were held on July 22, October 17, October 24, November 7, November 21 and November 28, 1988. The testimony was, to a large extent, confounding, confusing, contradictory and, insofar as the Debtor is concerned, mostly irrelevant and self-serving. Proposed findings of fact and conclusions of law and other post-hearing submissions were filed in January, February and March 1989. After consideration of the applicable legal standards and the determination of the 'relevant facts before us, we can only conclude that the appointment of a Chapter 11 trustee is required under 1104(a)(1).[1]

Based upon this Court's review of the papers submitted in support of and in opposition to the request for appointment of a trustee, the credible testimony and documentary evidence presented, the Chapter 11 case file and our own independent legal research, the Court makes the following findings of fact and conclusions of law pursuant to Bankruptcy Rules 9014 and 7052.[2]

### I.

V. Savino Oil & Heating Co., Inc. ("Debtor") filed a petition for reorganization under Chapter 11 of the Bankruptcy Code on November 20, 1987. Upon the filing of its Chapter 11 petition, the Debtor was thereby authorized to operate its business and manage its properties as a debtor-in-possession. The Debtor has a long history as a family business, having evolved from a retail fuel oil business formed more than fifty years ago by Vincent J. Savino ("Vincent Sr."). Vincent Sr. founded a retail fuel oil company in 1936 called V. Savino Fuel Oil. He incorporated his business around 1960 as V. Savino Oil and Heating Co., Inc., the Debtor herein. Until about one month prior to the Chapter 11 filing, the life blood of the Debtor's business was the sale of heating oil, initially to residential customers and later to commercial and industrial customers as well. The Debtor also engaged in activities derivative from and clearly ancillary to its main business of selling fuel oil. Such tangential business activities involved, trucking fuel oil and installing and servicing oil boilers and burners.

Vincent Sr. was owner of the Debtor until 1976, when he divided the stock of the corporation between his sons, Frank V. Savino ("Frank") and Vincent A. Savino ("Vincent Jr."). At that time, Vincent Sr. retired to Florida, ostensibly leaving the management of the Debtor to his two sons.

---

**1.** In reaching this conclusion, the Court has considered all the evidence and argument of counsel, regardless of whether or not they are specifically referred to in this decision.

**2.** Any finding that may more properly be considered a conclusion and any conclusion thay may more properly be considered a finding shall be so construed.

The Debtor states that Frank handled the finances and Vincent Jr. supervised the day to day physical operations. Disputes between the brothers over Frank's alleged financial dealings with certain third parties eventually led to the repurchase by the Debtor, in September 1985, of Frank's fifty percent interest, and the removal of Frank, in May 1986, as chief financial officer and president of the Debtor. Vincent Jr. thereafter assumed the position of president and G. Thomas Meier was installed as controller. A flurry of state court litigation between the brothers ensued with Frank seeking, among other things, to reclaim his interest in the Debtor, and Vincent Jr. asserting claims on behalf of the Debtor against Frank and various third parties. These suits are still pending. Since the apparent removal of Frank from the business, Vincent Jr., with the help of the controller, has been in control of the Debtor.[3] Advice and assistance has also been given by Vincent Sr., who sold his Florida condominium and came back home to Brooklyn.

According to Vincent Jr., it was primarily as a result of these internal management upheavals and Frank's alleged serious misconduct that the Debtor began to experience cash flow and other grave financial problems. By the summer of 1985, Chemical Bank ("Chemical"), the Debtor's primary lender, resolved to discontinue further funding of the Debtor's operations. At the time, Chemical was owed approximately $4 million. The indebtedness to Chemical is secured by most of the assets of the Debtor, including its customer list and present and future accounts receivable.

In order to continue to purchase oil product for sale to its customers, in April 1986, the Debtor executed a joint security agreement in favor of its two major suppliers, Bayside Fuel Oil Depot Corp. ("Bayside") and Cibro Terminals Inc. ("Cibro"). The agreement granted Bayside and Cibro a subordinate security interest in most of the Debtor's assets, including the customer list and accounts receivable. Soon after executing the agreement, Cibro stopped selling

oil to the Debtor and in or about October 1986, Bayside too ceased all sales of fuel to the Debtor.

The Debtor, however, was able to purchase fuel oil and meet customer orders from alternative sources such as Amerada Hess Corporation ("Hess") and Metro Terminals Corp. ("Metro") based upon bank letters of credit issued to Vincent Jr. in favor of Hess and Metro. Each letter of credit was originally issued in the amount of $100,000. The letter of credit in favor of Hess was issued on November 26, 1986 and had an expiration date, inclusive of extensions, of November 30, 1988. The letter of credit in favor of Metro was issued on December 18, 1986 and, as modified, had an expiration date of June 30, 1988. An additional letter of credit in the sum of $50,000 and due to expire on September 30, 1988 was obtained by Vincent Jr. on October 6, 1987 in favor of West Vernon Petroleum Corporation ("West Vernon"). Although the Debtor never utilized the West Vernon letter of credit, its purpose, like that of the Hess and Metro letters of credit, was to enable the Debtor to purchase fuel oil.

Meanwhile, in or about November 1986, secured creditors commenced litigation in state court to foreclose upon their collateral. In May 1987, a decision was rendered by the State Supreme Court, Kings County, allowing Chemical Bank to foreclose upon the collateral which, as indicated, includes the Debtor's customer list and accounts receivable. The May 1987 decision also granted Bayside the right to foreclose upon the collateral, subject to the prior interest of Chemical Bank. The state court decision posed an obvious threat to the Debtor's continued existence. In response thereto, the Debtor launched a two front affirmative offensive. First, it appealed the state court order. Second, a new corporation was formed on June 1, 1987 by Vincent Sr. The new corporation was tagged V. Savino Oil Co., Inc. ("V. Savino II"), an appellation virtually identical to the name of the Debtor (hereinafter sometimes

---

**3.** The statement of Financial Affairs filed with the Chapter 11 petition states that Vincent Jr. is the president, treasurer and sole shareholder of the Debtor.

referred to as "V. Savino I").[4] Vincent Sr. is the sole shareholder, officer and director of V. Savino II. At the time, V. Savino II, with an initial capitalization of $5,000, had no business, no customers and no sources of supply. It was dormant, but poised to be activated as a retail fuel oil company at an appropriate time.

The activation of V. Savino II was swift and sure, having been sparked by the Appellate Division's affirmance on October 13, 1987 of the lower court's May 1987 decision allowing foreclosure of V. Savino I's assets. Three days later, on October 16, 1987, V. Savino I and V. Savino II executed a rather remarkable agreement intended and designed to transform and reduce V. Savino I to a service arm of V. Savino II, with the latter selling fuel oil to persons or entities who were formerly customers of V. Savino I (hereinafter sometimes referred to as the "Metamorphosis Agreement"). On October 20, 1987—one month prior to the Debtor's Chapter 11 filing—V. Savino II commenced business operations. Not surprisingly, its situs of operations was at the same location as the Debtor, 389 Fourth Avenue, Brooklyn, New York.

Shortly after the commencement of operations by V. Savino II, the bank letters of credit in favor of Hess, Metro and West Vernon, under which the Debtor was able to purchase a significant portion of its fuel oil, were terminated by Vincent Jr. Significantly, such terminations were long prior to their respective expiration dates. On November 5, 1987, Vincent Jr. terminated the Hess letter of credit, under which the Debtor had been purchasing fuel oil and on the next day, November 6, 1987, V. Savino II obtained a new $100,000 letter of credit in favor of Hess from the same bank so as to enable it to purchase fuel oil from Hess. Similarly, on October 27, 1987, Vincent Jr. terminated the Metro letter of credit, under which the Debtor had also been purchasing fuel oil, and shortly thereafter, on November 6, 1987, V. Savino II obtained a new $80,000 letter of credit in favor of Metro from the same bank so as to enable it to purchase fuel oil from Metro. Finally, shortly after the commencement of operations by V. Savino II, on November 4, 1987, Savino Jr. terminated the West Vernon letter of credit, under which the Debtor could have purchased fuel oil. By terminating the bank letters of credit, Vincent Jr. disabled the Debtor from obtaining fuel oil for sale to its customers and facilitated purchases of oil for sale to those very same customers by V. Savino II. To fund the purchase of fuel oil, Vincent Sr. "loaned" monies to V. Savino II, borrowed certificates of deposit from a friend and an uncle of Vincent Jr.'s wife to collateralize the reissued letters of credit and obtained, on behalf of V. Savino II, a line of credit from Ferrantino & Co., a company owned by Vincent Jr.'s father-in-law.[5]

The Metamorphosis Agreement executed by V. Savino I and V. Savino II one month prior to the Chapter 11 filing was by its terms unlimited in duration and scope. It contemplated the furnishing of an array of support services by the Debtor for V. Savino II on behalf of the customers of V. Savino II. Specifically, the Debtor was to provide trucking, oil burner service and installation and administrative services for the new company, V. Savino II.[6] The fact that V. Savino II had no customers posed no problem. The customers of V. Savino II were to be none other than the customers of V. Savino I, the Debtor. Indeed, Vincent Jr. on April 6, 1988 in a moment of candor during his deposition, characterized the customers of V. Savino II as the Debtor's *former* customers.

---

**4.** The obvious purpose of the masquerade was to cause persons and entities, particularly customers, into believing they would still be dealing with the Debtor rather than a new and separate corporate entity.

**5.** Testimony adduced on behalf of the Debtor was that Ferrantino & Co. refused to extend credit to the Debtor.

**6.** In consideration for these services, V. Savino II was to pay the Debtor 11 cents for each gallon of oil trucked, 95% of Savino II's billings for oil burner service and installation work, and $15,000 per month for administrative work.

Upon commencement of operations by V. Savino II the Debtor turned over virtually all of its customer orders to the new company. The switch of the Debtor away from the business of retail oil distribution was almost total. Upon gaining access to the books and records of V. Savino II, the accountants for the Creditors Committee uncovered the following pertinent information:

a) During the period of October 20, 1987 through March 31, 1988, V. Savino II had heating oil sales of $5,595,889 made to customers of the Debtor from which V. Savino II had a gross profit of $651,590 and a net profit of $385,565; and

b) With respect to the collective heating oil sales by both the Debtor and V. Savino II between October 20, 1987 and March 31, 1988, 97% of said sales were made by V. Savino II and only 3% were made by the Debtor.

The effect of the Metamorphosis Agreement and its implementation was to alter drastically the nature of the Debtor's operations. The Debtor became a trucker and oil burner installation/maintenance business. The all important selling or retail fuel operations were shifted to V. Savino II. This transmutation, launched in October 1987, per force resulted in a *de facto* transfer of the Debtor's customer list, its most valuable asset, and receivables derived therefrom to V. Savino II. The purpose of the arrangement with V. Savino II was to position these assets beyond the reach of the Debtor's creditors. Indeed, prior to October 1987, the Debtor threatened certain creditors who sought to recover money owed to them that unless they ceased pressuring, the Debtor's customers would be transferred to another entity and, as a result, creditors would be unable to recover on their claims.

## II.

The Debtor filed its petition for reorganization under Chapter 11 of the Bankruptcy Code on November 20, 1987. The Chapter 11 petition makes no reference to the existence of V. Savino II or an arrangement

under which another entity and not the Debtor, was selling fuel oil to the Debtor's customers. The Statement of Executory Contracts dated November 20, 1987 and signed by Vincent Jr. on behalf of the Debtor is mute as to the October 16, 1987 agreement with V. Savino II. Exhibit A to the Chapter 11 petition describes misleadingly the Debtor's business as being a "[d]istributor of heating oil". Vincent Jr.'s Rule 11 affidavit annexed to the Chapter 11 petition describes deceitfully the Debtor's business as a "retailer of fuel oil and related boiler/burner service and installation." Interestingly, the Rule 11 affidavit does discuss changes in the Debtor's operations, but makes no mention of the single most significant one, i.e., that V. Savino II, rather than the Debtor, was filling virtually all customer orders and that the Debtor was relegated to performing ancillary services. Thereafter, monthly operating reports prepared and filed by the Debtor failed to disclose the relationship with V. Savino II. On December 22, 1987, a hearing was held before this Court to consider an application of the Debtor to use cash collateral for the purpose of, among other things, purchasing fuel oil in order to fill customer orders. The Debtor, however, failed to disclose to the Court the arrangement with V. Savino II under which virtually all fuel oil was purchased and virtually all customer orders were being filled by V. Savino II.

In sum, the existence of V. Savino II and its arrangement with the Debtor was not only undisclosed to this Court, but affirmatively concealed from it. The arrangement with V. Savino II continued for a substantial period of time after the filing of the Debtor's Chapter 11 petition. At no time was the arrangement authorized by this Court or exposed to the crucible of notice and a hearing.

## III.

The existence of V. Savino II was not uncovered until early April 1987 and only then as a result of the Creditors' Committee[7] investigation under 11 U.S.C.

7. The Creditors' Committee herein is a reconstituted one. A Creditors' Committee was appoint-

§ 1103(c)(2).[8] Upon learning of the existence of V. Savino II, the Creditors' Committee requested voluntary access to V. Savino II's books and records. That request was denied. On April 28, 1988, the Court granted an application of the Creditors' Committee and ordered the books and records of V. Savino II to be made available to the Committee's accountants.

On or about July 14, 1988, the Creditors' Committee commenced adversary proceedings seeking, *inter alia,* injunctive relief preventing V. Savino II, Vincent Sr, Vincent Jr. or anyone else, other than the Debtor, from using the Debtor's customer list. Simultaneously with the commencement of the adversary proceedings, the Creditors' Committee sought and obtained a temporary restraining order. A preliminary injunction was issued by this Court on October 14, 1988, prohibiting anyone other than the Debtor from using the Debtor's customer list.

Meanwhile, evidentiary hearings on the instant bitterly opposed motion for appointment of a Chapter 11 trustee, also initiated on or about July 14, 1988 by the Creditors' Committee, were continuing without an end in sight. On November 7, 1988, the Creditors' Committee agreed to limit the issues solely for the purpose of expediting the hearings and the determination of its motion for appointment of a Chapter 11 trustee. Taking up a suggestion of the Court at a Chambers Conference with the parties to speed the matter along, the Creditors' Committee limited the basis for its request for a Chapter 11 trustee to the V. Savino II saga.[9]

### IV.

■ Typically, in a business reorganization case under Chapter 11 of the Bankruptcy Code a debtor will remain in possession, meaning that pre-Chapter 11 management will continue to manage the debtor's affairs. The underlying assumption of Chapter 11 is that debtor-in-possession governance is to be the norm. This assumption arises from a belief that current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate. A Chapter 11 filing may ensue for numerous reasons independent of the abilities and integrity of current management. The mere filing does not demonstrate that the debtor is incapable or unsuited to superintend its own reorganization. *Dardarian v. La Sherene, Inc. (In re La Sherene, Inc.),* 3 B.R. 169, 174 (Bankr.N.D.Ga.1980).

■ The filing of a Chapter 11 petition does, however, cause a fundamental *legal change* in the entity. The filing entity is legally different from what it was the moment before filing, as it now assumes the mantle of a new juridical entity, a debtor-in-possession. As such it becomes an officer of the court subject to the supervision and control of the Bankruptcy Court and the provisions of the Bankruptcy Code. A debtor-in-possession in a Chapter 11 case has the same fiduciary duties as a trustee appointed by a court. *In re Lavender,* 48 B.R. 393, 396 (Bankr.E.D.Ark.1984). Indeed, the debtor-in-possession occupies the shoes of a trustee in every major way. 11 U.S.C. §§ 1107(a) and 323(a); *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 200 n. 3, 103 S.Ct. 2309, 2311 n. 3, 76 L.Ed.2d 515 (1983); *In re Hughes,* 704 F.2d 820, 822 (5th Cir.1983). As a *de jure* trustee, the debtor-in-possession holds its pow-

---

ed on December 17, 1987. However, the United States Trustee mistakenly appointed Ferrantino & Co., an entity owned by the father-in-law of Vincent Jr., to the Creditors' Committee and gave three seats to one creditor holding claims under three different names. An amended Creditors' Committee was appointed on February 23, 1988. By order dated March 21, 1989, the Creditors' Committee was authorized to retain accountants. By order dated March 23, 1988, the Creditors' Committee was authorized to retain substituted counsel.

8. Section 1103(c)(2) of the Bankruptcy Code authorizes a statutory committee to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor ...;"

9. Various other allegations of questionable business transactions or dealings between the Debtor and related/affiliated persons or entities, including companies owned or controlled by Vincent Jr. or persons related to Vincent Jr., were dropped for purposes of the trustee motion.

ers in trust for the benefit of creditors. *In re Martin Custom Made Tires Corporation*, 108 F.2d 172, 173 (2nd Cir.1939); *In re Paolino*, 53 B.R. 399, 401 (Bankr.E.D. Pa.1985); *In re Modern Office Supply, Inc.*, 28 B.R. 943, 944 (Bankr.W.D.Okl. 1983); *In re E. Paul Kovacs and Co., Inc.*, 16 B.R. 203, 205 (Bankr.D.Conn.1981). As the Supreme Court observed:

> "[S]o long as the Debtor remains in possession, it is clear that the *corporation* bears essentially the same fiduciary obligations to the creditors as does the trustee for the Debtor out of possession." [Emphasis in Original].

*Wolf v. Weinstein*, 372 U.S. 633, 649, 83 S.Ct. 969, 979, 10 L.Ed.2d 33 (1963).

We now turn to Section 1104(a) of the Bankruptcy Code, 11 U.S.C. § 1104(a), the provision of Chapter 11 governing the appointment of a reorganization trustee to replace the debtor-in-possession. Section 1104(a) reads, in relevant part, as follows:

> "(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest ... and after notice and a hearing, the court *shall order* the appointment of a trustee—
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after commencement of the case, or similar cause ...; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders and other interests of the estate...." [Emphasis Added].

If the court determines that a trustee should be appointed, "then the United States trustee, after consultation with the parties in interest, shall appoint, subject to the court's approval, one disinterested person ... to serve as trustee ... in the case." 11 U.S.C. § 1104(c).

Section 1104(a) is phrased in the disjunctive, meaning that there are two discrete predicates for the appointment of a reorganization trustee. Such appointment is authorized upon a showing of cause, as defined, or demonstration that the appointment is in the interests of the parties. Once the court has found that cause exists under § 1104(a)(1); there is no discretion; an independent trustee must be appointed. *In re Oklahoma Refining Company*, 838 F.2d 1133, 1136 (10th Cir.1988); *In re St. Louis Globe–Democrat, Inc.*, 63 B.R. 131, 138 (Bankr.E.D.Mo.1985); *In re Ford*, 36 B.R. 501, 504 (Bankr.W.D.Ky.1983); *In re Deena Packaging Industries, Inc.*, 29 B.R. 705, 706 (Bankr.S.D.N.Y.1983); *In re Bonded Mailings, Inc.*, 20 B.R. 781, 786 (Bankr.E.D.N.Y.1982); *In re McCordi, Corp.*, 6 B.R. 172, 177–178 (Bankr.S.D.N.Y. 1980); *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 644 (Bankr.E.D.N.Y.1980) (Under § 1104(a)(1) the court's discretionary powers are circumscribed and limited to a judicial determination of whether "cause", as enumerated, exists). Unlike subsection (a)(1), § 1104(a)(2) may well, entail the exercise of a spectrum of discretionary powers and equitable considerations, including a cost-benefit analysis, to determine whether the appointment of a reorganization trustee would be in the interests of creditors, equity security holders and other interests of the estate. *In re Deena Packaging Industries, Inc., supra., In re Anchorage Boat Sales Inc., supra.*

Section 1104(a) represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession. Under § 1104(a)(1), the words "including" and "or similar cause" before and after the enumerated examples of cause and 11 U.S.C. § 102(3) indicate that the grounds for appointing a reorganization trustee are not even limited to the derelictions specifically enumerated. The mandate of § 1104(a)(1) is explicit and should be enforced according to its plain language. *United States v. Ron Pair Enterprises, Inc.*, —— U.S. ——, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

As discussed above, debtor-in-possession governance is the norm in Chapter 11. However, the encompassing language of Section 1104(a)(1) prefaced by a mandatory "shall" reflect an equally important countervailing or balancing congressional in-

tent. The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in-possession defaults in this respect, Section 1104(a)(1) commands that the stewardship of the reorganization effort must be turned over to an independent trustee.

## V.

■ The sole question presented in a Section 1104(a)(1) motion is whether the acts or omissions of current management, whether committed before or after filing the Chapter 11 petition, supply the "cause", as defined, to trigger the appointment of a trustee. The timing, facts and circumstances surrounding the formation of V. Savino II, execution of the October 16, 1987 Metamorphosis Agreement and activation of V. Savino II represented a calculated and calibrated effort in contemplation of the Chapter 11 filing to place the Debtor's retail fuel operations beyond the reach of creditors. This pre-petition course of conduct, in and of itself, constitutes "cause" for the appointment of a Chapter 11 trustee.[10]

■ A debtor-in-possession, while receiving the benefits of a Chapter 11 filing, particularly the automatic stay, also assumes numerous responsibilities and obligations. One of the most fundamental and crucial duties of a debtor-in-possession upon the filing of a Chapter 11 petition is to keep the Court and creditors informed about the nature, status and condition of the business undergoing reorganization. The requirement of full and fair disclosure is not restricted to disclosure statements filed under 11 U.S.C. § 1125 in the latter stages of Chapter 11 cases in connection with the solicitation of acceptances or rejections of reorganization plans. Open, honest and straightforward disclosure to the Court and creditors is intrinsic to the entire reorganization process and begins on day one, with the filing of the Chapter 11 petition.

In its Chapter 11 petition, this Debtor failed to disclose i) the transformation of its business; ii) that its retail fuel business was being conducted by V. Savino II; iii) that V. Savino II was selling fuel oil to its customers; iv) the relationship or arrangement with V. Savino II, or v) even the very existence of V. Savino II.

■ Where, as here, the Debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11 trustee is required. *See, e.g., In re Deena Packaging Industries, Inc., supra.* Moreover, in this case not only did the Debtor fail to disclose the V. Savino II adventure but, as shown above, made affirmative efforts to misrepresent or conceal such important matters. Significantly, the existence of V. Savino II and its arrangement with the Debtor was not made known to the Court until many months after commencement of the Chapter 11 case, and then not by the Debtor—but as a result of papers filed by the Creditors' Committee.

Fifty years ago, the Supreme Court pointed out that "the debtor, though left in possession ... does not operate [the business], as it did before the filing of the petition, unfettered and without restraint." *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 125–126, 60 S.Ct. 1, 12, 84 L.Ed. 110 (1939). This sound proposition has not been altered by Chapter 11. A debtor-in-possession cannot use assets other than in the ordinary course of business absent notice and a hearing and judicial authorization. 11 U.S.C. §§ 363(b). While a presumption of reasonableness or propriety attaches to a debtor's management decisions with regard to transactions within the ordinary course (11 U.S.C. § 363(c)), extraordinary transactions are required to be brought to the attention of the Court and creditors under 11 U.S.C. § 363(b), so as to permit judicial scrutiny and to allow

---

**10.** One aspect of this course of conduct which was particularly disturbing was the termination of bank letters of credit under which the Debtor was able to purchase fuel oil product and their reissuance to V. Savino II so as to enable it and not the Debtor to purchase product. These steps were obviously for the benefit of V. Savino II and to the Debtor's detriment.

creditors to articulate any objections to the debtor's proposals.

■ This Debtor thumbed its nose at § 363(b). There was no notice and a hearing. Judicial authorization was never obtained or even sought. Yet, the Debtor after its Chapter 11 filing continued a most extraordinary employment of its most valuable asset. The Debtor's customer base or list was being used by a newly created, related entity, V. Savino II. Furthermore, apart from the § 363(b) violations, unauthorized post-petition transfers of estate assets constitute grounds for appointment of a Chapter 11 trustee. *In re McCorhill Publishing Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y.1987); *In re Lavender*, 48 B.R. at 396; *In re Ford*, 36 B.R. at 504; *See*, 11 U.S.C. § 549(a).

■ In this case it is not necessary to delineate whether the cause consists of fraud, dishonesty, incompetence, gross mismanagement "or similar cause". The result is the same since the finding of any one of these causes within the penumbra of fiduciary neglect, as defined, mandates appointment of a trustee. Here, the Debtor's pre-petition conduct, post-petition non-disclosures and misrepresentations, and non-compliance with statutory requirements relating to V. Savino II, singularly and in the aggregate, constitute "cause" within the meaning of 1104(a)(1) for appointment of a reorganization trustee.[11]

## VI.

Of the many arguments in opposition made by the Debtor only some three of them seem even worthy of some mention and not because of any intrinsic merit, but simply because of the intensity of the contentions. The Debtor claims that it never transferred its business or its customer list to V. Savino II and blithely asserts that

only if a customer order could not be filled by the Debtor was it "given over" to V. Savino II. This is sheer self-serving sophistry not borne out by the credible evidence. The Debtor's inability to fill customer orders arose, in large part, upon termination of bank letters of credit by Vincent Jr. Surely, the reissuance of those bank letters of credit to V. Savino II was not a mere coincidence. V. Savino II had substantial sales immediately upon its activation even though it had no prior business or customers. The October 16, 1987 agreement between the Debtor and V. Savino II, read on the whole, speaks in terms of the Debtor's customer list and retail fuel oil business as belonging to V. Savino II and not the Debtor. Indeed, Savino Jr. admitted at an April 6, 1988 deposition that V. Savino II's customers were none other than the "former" customers of the Debtor. In addition, the October 16, 1987 agreement had no termination date or other qualifications and would seem to have established an arrangement in perpetuity—the functional equivalent of a *de facto* transfer of the Debtor's customer list and business to V. Savino II.

Secondly, the Debtor asserts that, i) the V. Savino II arrangement was necessary to obtain needed financial assistance from or through Savino Sr. so as to assure uninterrupted customer service and ii) the arrangement with V. Savino II was a good deal for the Debtor. These arguments are easily punctured. V. Savino II was formed and activated pre-petition in direct response to litigation lost in the state courts. To the extent, if any, the Debtor needed to obtain credit or financial assistance after the Chapter 11 filing, the exclusive avenue was through 11 U.S.C. § 364. Section 364 of the Bankruptcy Code, 11 U.S.C. § 364, provides for post-petition obtaining of credit only after notice and a hearing and judicial

11. Our conclusion that a trustee is mandated under § 1104(a)(1) renders unnecessary consideration of § 1104(a)(2). We would only note that the factors constituting a basis for appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a great deal of judicial discretion. In essence, however, it seems that § 1104(a)(2) reflects "the practical reality that a trustee is needed". *In re Sharon*

*Steel Corp.* 86 B.R. 455, 458 (Bankr. W.D.Pa. 1988). Where, as here, it appears that no meaningful progress towards reorganization is possible because of deep rooted animosities between a Debtor and major creditors, an independent reorganization trustee may well be necessary to insulate the reorganization process from paralytic conflict.

authorization. The Debtor, however, preferred to be oblivious of § 364. Similarly, whether or not the arrangement with V. Savino II was beneficial could only be determined with the input of the Court and creditors upon compliance with § 363(b), a provision also ignored by the Debtor. When a debtor seeks protection from its creditors under Chapter 11, it is constrained to observe the letter and spirit of the statute granting it protection. A debtor cannot unilaterally determine that the protections offered by statutes such as 11 U.S.C. § 363(b) and 364 are unnecessary, proceed to ignore those statutes, and yet hope to superintend its own reorganization as a debtor-in-possession.

▇ Finally, the Debtor contends that benefits conferred by a trustee are not commensurate to the attendant expense and that the appointment of a trustee may jeopardize the rehabilitation effort. These arguments are also without merit. They represent "just another way of stating the natural preference of debtor's management" to remain in control without the interference of independent scrutiny by a disinterested trustee. *SEC v. American Trailer Rentals Co.*, 379 U.S. 594, 617, 85 S.Ct. 513, 526, 13 L.Ed.2d 510 (1965). Furthermore, a cost/benefit analysis under 11 U.S.C. 1104(a)(1) is inappropriate. The version of § 1104(a) contained in H.R. 8200 was never enacted into law. That statute would have made the appointment of a trustee in Chapter 11 cases entirely discretionary and would have legislated a cost/benefit analysis in all instances. *See,* H.R.Rep. No. 595, 95th Cong., 1st Sess. 402(1977), U.S.Code Cong. & Admin.News 1978, 5787. H.R. 8200, 95th Cong. 1st Sess. § 1104(a), as reported by the House Committee, provided that:

> "(a) At any time after the commencement of the case, but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court *may order* the appointment of a trustee if-
>
> > (1) the protection afforded by a trustee is needed; *and*
> >
> > (2) the costs and expenses of a trustee would not be disproportionately higher

than the value of the protection afforded. [Emphasis added]."

Section 1104(a) of the Bankruptcy Code, as enacted in 1978, rejected flatly the concept that the appointment of trustees in Chapter 11 cases should be entirely discretionary and, at least, insofar as § 1104(a)(1), eliminated a cost/benefit exercise. Once the requisite "cause" is shown under § 1104(a)(1), a Chapter 11 trustee must be appointed. Moreover, whether or not the trustee's efforts will be capped with success is not relevant under § 1104(a)(1). The Court need only decide whether the requisite "cause" exists. The granting of a motion under § 1104(a)(1) is merely a judicial determination that all matters relating to the rehabilitation and reorganization must be under the aegis of an independent trustee. *See, SEC v. American Trailer Rentals Co.*, 379 U.S. at 618, 620 n. 20, 85 S.Ct. at 526, 527 n. 20.

## CONCLUSION

Based upon all of the foregoing, the motion of the Creditors' Committee for appointment of a Chapter 11 trustee is granted pursuant to 11 U.S.C. § 1104(a)(1). The conduct of the Debtor's current management both before and after commencement of the Chapter 11 case falls far short of that expected of estate fiduciaries and officers of the Court. Accordingly, they can no longer exercise the privilege of debtor-in-possession stewardship in this Chapter 11 case. While the debtor-in-possession may be the norm, the facts here dictate the exception.

The United States Trustee will appoint, subject to Court approval and otherwise in accordance with 11 U.S.C. § 1104(c), a disinterested trustee. Hopefully, the trustee will bring a refreshing air of objectivity and impartiality to a Chapter 11 case which has gone nowhere for some seventeen months to the detriment of all parties in interest, including the Debtor.

A SEPARATE ORDER CONSISTENT WITH THIS DECISION IS BEING ISSUED CONTEMPORANEOUSLY.