**In re Catherine Duffy PETIT, Appellant,**

v.

**NEW ENGLAND MORTGAGE SERVICES INC., Appellee.**

Civ. No. 94–155–P–C.

United States District Court, D. Maine.

May 8, 1995.

Stephen F. Gordon, Gordon & Wise, Boston, MA, Zbigniew J. Kurlanski, Portland, ME, for Catherine Duffy Petit.

John G. Connor, Portland, ME, for New England Mortg. Services Inc.

## MEMORANDUM AND ORDER

GENE CARTER, Chief Judge.

Appellant/Debtor, Catherine Duffy Petit (hereafter "Debtor") brings this appeal seeking reversal of the bankruptcy court's April 26, 1994, Order Authorizing Appointment of Chapter 11 Trustee. The Debtor argues that the record does not establish an adequate basis for the appointment of a trustee and that, therefore, such an appointment by the bankruptcy court constitutes an abuse of discretion. The complete facts and procedural history of this bankruptcy case are complicated and have been indicated in other opinions of this Court. The Court here restricts its recitation of the facts to those directly relevant to the present appeal.

## I. FACTS AND PROCEDURAL HISTORY

This case began as an Involuntary Petition in Bankruptcy under chapter 7 on June 4, 1993, filed by several creditors of the Debtor including New England Mortgage Services Company, Inc. (hereafter "NEMS"), the Appellee here. The postpetition proceedings have been hampered by numerous discovery disputes, particularly regarding the taking of the Debtor's deposition and her production of documents.

The focus of nearly every dispute and appeal in this case thus far is the single asset of the Debtor, a "chose in action" or lawsuit, pending in the Maine Superior Court since 1988, and any settlement proceeds thereof. At the time of its filing, the suit was brought by the Debtor against Key Bank of Maine (hereafter "Key Bank") and the law firm of Bernstein, Shur, Sawyer & Nelson (hereafter "BSSN"). In December of 1990, the Debtor reached a settlement with BSSN regarding her claims against the firm. The Debtor and BSSN also signed a confidentiality agreement, filed with the Maine Superior Court, which precludes any disclosure of the settlement terms, "except as required by law, rule, regulation or court order." Record (hereafter "Rec.") A, Vol. I–15 at 140.[1] The Debtor did not disclose the terms or the fact of the settlement to her creditors at the time the settlement was reached. The lawsuit now consists of only one count against Key Bank and remains pending in Maine Superior Court.

NEMS issued a notice on September 2, 1993, that it would take the deposition of the Debtor and requested that the Debtor bring certain documents with her, including "all documents evidencing the receipt and disposition of settlement funds from or on behalf of [BSSN] in the action entitled *Catherine Petit v. Key Bank, et al.*" Rec. B, Vol. I–12. The deposition had to be rescheduled, and several disputes between the Debtor and NEMS arose regarding the manner in which discovery would proceed.

NEMS brought these disputes to the attention of the bankruptcy court in its Motion to Compel, filed September 21, 1993, Rec. B,

---

1. There were two "records," one by Appellant and another by Appellee, submitted to this Court for the purposes of this appeal. Since both records are numbered in the same manner, the result is that the complete record consists of two different documents designated as "Volume I–1" and so forth. To minimize confusion, the Court will distinguish between the two records by referring to the material submitted by Appellant, Catherine Duffy Petit, as "Record A," and those submitted by Appellee, NEMS, as "Record B."

Vol. I–13, in which NEMS reiterated its request for the settlement documents. On October 6, 1993, the bankruptcy court issued an Order requiring the Debtor to appear for a deposition and to "produce all of the documents requested in [NEMS's] Notice of Deposition." Rec. B, Vol. I–17. The Debtor failed to appear at the rescheduled deposition and filed a Motion to Alter or Amend the bankruptcy court's October 6, 1993, Order, asking, *inter alia,* that the court eliminate the requirement that she produce the documents. Rec. B, Vol. I–19.

On October 28, 1993, the bankruptcy court amended the prior order, restricting the document production requirement to only those items "relating to the propriety of the entry of an order for relief under 11 U.S.C. § 303." Rec. B, Vol. I–22. That amended order, however, was vacated after the bankruptcy court heard the arguments of counsel on NEMS's Motion for Rule 37 Sanctions. The bankruptcy court wrote, "[u]pon consideration of the history of this case to date, and based upon the arguments of counsel, NEMS is given wide latitude to inquire into the location and extent of assets of the alleged Debtor, within the confines of the discovery process, for the express purpose of opposing Ms. Petit's Motion to Dismiss the involuntary petition." Rec. B, Vol. I–23.

After rescheduling the deposition on two more occasions, the Debtor finally appeared for her deposition on November 30, 1993, but without any of the documents requested by NEMS. Rec. A, Vol. I–15 at 36. NEMS renewed its motion for sanctions and, although it declined to impose sanctions, the bankruptcy court made remarks on the record regarding its frustration with the Debtor's conduct during discovery.[2] Despite the fact that the BSSN confidentiality agreement

explicitly permits disclosure of the settlement terms in response to a court order, the Debtor continued to use the agreement as a shield against discovery inquiries. Rec. A, Vol. I–15 at 36. There is conflicting testimony in the record regarding whether the Debtor was acting on the advice of an attorney regarding such disclosures.[3]

After the bankruptcy court entered the Order for Relief on December 10, 1993, the Debtor moved to convert the case from chapter 7 to chapter 11 pursuant to section 706(a) of title 11. NEMS filed its opposition to the conversion along with a motion requesting, in the alternative, the appointment of a chapter 11 trustee. The bankruptcy court held an evidentiary hearing on both motions on February 7 and 8, 1994.

Several issues surfaced at that hearing. For instance, the Debtor was unable to provide a precise accounting of the $3.9 million received in the BSSN settlement and claimed that she had no information about or control over the funds. Rec. A, Vol. I–15 at 30–31, 36–37. The Debtor testified that a large portion of the money was paid to the various attorneys involved with the Key Bank litigation. Rec. A, Vol. I–15 at 28. She also acknowledged that her friends Paul Richard ("Richard") and Edward Simpson ("Simpson") were each paid out of the settlement proceeds. Rec. A, Vol. I–15 at 31.

Other creditors were paid from the settlement proceeds but the Debtor's explanation of the method employed to determine which creditors would receive any portion of the settlement funds was unclear. The basis she testified to at the hearing was whether the creditors had liens or attachments on the lawsuit's proceeds and the "availability [sic][4]

---

2. The bankruptcy court noted during the arguments on the sanctions motion,

    I'm satisfied that the alleged debtor is still not forthcoming to anywhere near a reasonable standard.... [The debtor is] playing games with the Court and with the parties, and this is a pattern which continues. So I'm going to adopt all of the arguments and all of the positions taken by New England Mortgage Services Company.

    Rec. B, Vol. I–27 at 23–24.

3. The Debtor testified that she refused to produce the documents regarding the BSSN settlement

funds because of advice provided by her attorney, Richard Grahn, who represents her in the Key Bank proceedings. Record A, Vol. I–15 at 35. Attorney Grahn, however, denied providing such advice and, in fact, denied any knowledge that the Debtor was under court order to produce the documents. *Id.* at 143–44.

4. The Court assumes that the use of this word may be a reporter's error and that the Debtor actually testified that a factor was her *ability* to settle some claims.

to settle some of the claims." Rec. A, Vol. I–15 at 55–57. The latter reference addresses an arrangement the Debtor made with Richard, in which he purchased several judgments from various creditors, including NEMS, at a considerable discount and then, pursuant to an agreement with the Debtor, waived them. Rec. A, Vol. I–15 at 25, 69. The Debtor testified initially that Richard was not making these purchases on her behalf, Rec. A, Vol. I–15 at 26, although the Debtor acknowledged later in her testimony that the purchases were "the only means I was told were available to settle these claims." Rec. A, Vol. I–15 at 76.

There was also testimony to the effect that one of the Debtor's attorneys provided money from the settlement to the Debtor. The Debtor testified that she was given $130,000 which she used to live on for three-and-a-half years and had exhausted by the time of the hearing. Rec. A, Vol. I–15 at 34. The Debtor also stated that she kept no records of her expenses during that time period and had not filed a tax return since 1989. Rec. A, Vol. I–15 at 61–63. One of the Debtor's attorneys, Ronald Caron, testified that he received a check for a $1.3 million portion of the settlement, distributed $78,000 immediately to the Debtor, and "probably" paid additional amounts to her from money that came through the escrow account that he maintained. Rec. A, Vol. I–16 at 27. The Debtor's testimony also revealed that she was borrowing very large sums from Simpson and Richard. Rec. A, Vol. I–15 at 68.

Thus it was not until the February 7 and 8 hearing, several months after NEMS initiated discovery on the issue, that counsel for NEMS was able to obtain some information on the distribution of the BSSN settlement funds. Much of this information was obtained through the testimony of two of the Debtor's attorneys who distributed these funds. The information, however, did not provide a detailed accounting of the funds, and the bankruptcy court ordered the Debtor to file such an accounting after the completion of the hearing. Rec. A, Vol. I–15 at 52; Rec. B, Vol. I–12.

The Debtor called three witnesses at the hearing, all of whom were attorneys working for her, to support her argument that the appointment of a trustee, and, therefore, the substitution of the trustee as the plaintiff in the state court litigation, would have a detrimental effect on the Debtor's position in the Key Bank litigation. For example, Attorney Daniel W. Mooers, who is himself a creditor of the Debtor and had previously filed a "creditor's opposition" to NEMS's motion to appoint a trustee, testified that he thought that a jury would be less sympathetic to a trustee as a plaintiff than to the Debtor as a plaintiff. Rec. A, Vol. I–15 at 92. Attorney Richard Grahn, the Debtor's primary attorney in the Key Bank litigation, testified that he was not inclined to represent a trustee in the case and that he was "concerned with the relationship of Catherine Petit to the litigation and what effort she was going to undertake in terms of continued involvement in the litigation." Rec. A, Vol. I–15 at 130, 133, 170. Attorney Ronald Caron also testified that, in his opinion, the appointment of a chapter 11 trustee would be detrimental to the Key Bank litigation. Rec. A, Vol. I–16 at 8.

At the conclusion of the hearing, the bankruptcy court informed the parties that it was granting the Debtor's Motion to Convert but was reserving judgment on NEMS's motion to appoint a trustee. Rec. A, Vol. I–15 at 68, 112. The bankruptcy court did, however, make several observations during the hearing suggesting that it was inclined to appoint a trustee. The Court stated at one point, during a discussion with the Debtor's attorney regarding whether the Debtor was being an "obstructionist," that the Debtor did not keep any financial records and, further, that

She has no bank accounts. She has [her attorney] Mr. Caron giving her $78,000 in cash [from the BSSN settlement funds]. Maybe part of $132,000 somewhere else. We still don't know what happened. Where. When. Anything. I consider this evasiveness, obstructionist [sic] and I would not feel comfortable if I were a creditor in the case who was not Mr. Richard or Mr. Simpson or somebody like that.

*Id.* at 86.

The bankruptcy court also heard the arguments of counsel on the motion to appoint a trustee. The Debtor argued that, while she

had presented evidence regarding the negative impact of such an appointment, NEMS had failed to demonstrate why a trustee should be appointed. She also pointed out that some of her creditors, namely Attorney Mooers, Attorney Caron, and Simpson, opposed the appointment of a trustee. NEMS, on the other hand, argued that such an action was necessary since the Debtor made a "secret settlement" with BSSN, preferred certain creditors in distributing the proceeds from the settlement, left the state to avoid her creditors, failed to maintain financial records or bank accounts of any sort, pursued an arrangement with her friend in which he purchased judgments against her—possibly with settlement funds she provided to him— and then "waived"[5] the judgment claims, and, that she generally acted in an obstructionistic manner during the proceedings. Record A, Vol. I–16 at 60–62.

The court stated at the conclusion of the hearing, "[t]he Court intends to act on the motion for the appointment of a Trustee and probably will appointment on [sic] forthwith, and for all the reasons argued by [NEMS]." Rec. A, Vol. I–16 at 111. Subsequently, during an April 15, 1994, telephone conference between the bankruptcy court and the parties, the court announced its intention to appoint a chapter 11 trustee. Rec. A, Vol. I–17 at 13. This statement was also provided in the court's April 26, 1994, Order Authorizing Appointment of Chapter 11 Trustee.

Rec. A, Vol. I–14. The Debtor then brought this appeal from that decision.

## II. DISCUSSION

■ Although this Court freely reviews conclusions of law made by a bankruptcy court, findings of fact by the bankruptcy court will be set aside only if they are "clearly erroneous." *In re Garland Corporation,* 6 B.R. 456, 460 (Bankr. 1st Cir.1980).[6] Although the decision of the bankruptcy court came after two days of testimony, the court did not provide a specific description of its individual findings when it ruled on the motion to appoint a trustee. Accordingly, for the purposes of this appeal, this Court has reviewed the complete record as designated by the parties, including remarks made by the bankruptcy court regarding its view of the evidence, to determine the factual basis for the bankruptcy court's decision to appoint a trustee.

■ The appointment of a chapter 11 trustee is considered to be an "extraordinary" act since, in the usual case, the debtor remains a debtor-in-possession throughout reorganization. *In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 167 (Bankr.S.D.N.Y.1990). The presumption in chapter 11 cases is that "current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate."[7] *In re V. Savino Oil &*

---

5. The Court presumes that the references to Richard's "waivers" can be substantiated with documentary evidence demonstrating that the claims were properly extinguished. No such evidence was included in the record presented in this appeal.

6. The Debtor argues that the bankruptcy court's decision to appoint a chapter 11 trustee should be reviewed under an "abuse of discretion" standard as was employed by the Court of Appeals for the Third Circuit in *In re Sharon Steel Corp.,* 871 F.2d 1217 (3d Cir.1989). The panel there appears to criticize the standard used by the First Circuit in *Garland Corporation,* and concludes that an abuse of discretion standard is most appropriate for determining the existence of "cause" under subsection (a)(1) and employing the "flexible standard" of (a)(2). *Sharon Steel,* 871 F.2d at 1225. However, the panels in both *Sharon Steel* and *Garland Corporation* agree that a bankruptcy court's factual finding are reviewed for clear error, and conclusions of law

receive plenary review. Moreover, if there is any actual distinction between these standards of review, it is of no significance here since this Court would reach the same conclusion under either standard.

7. This Court notes that the rationale for the presumption of a debtor remaining in possession of the estate has limited applicability here. In a typical Chapter 11 proceeding, the "Debtor" will be a business run by individuals with experience in that business. As long as there are no findings of fraud or other mismanagement by the current management, it can be assumed that the business would fare better being run by experienced management during the reorganization process. Here the Debtor is an individual who owns only one remaining asset, the cause of action. Thus, there is no "business" that requires day-to-day operation to generate profits. Accordingly, there is less of a need to have the Debtor continue in the management of her affairs.

*Heating Co.,* 99 B.R. 518, 524 (Bankr. E.D.N.Y.1989). The party seeking the trustee's appointment has the burden of establishing the need for such action and, although the Court of Appeals for the First Circuit has never held so directly, many courts require a showing of clear and convincing evidence supporting the motion prior to taking such action. *See, e.g., In re Sharon Steel,* 871 F.2d 1217, 1226 (3d Cir.1989); *Ionosphere Clubs,* 113 B.R. at 168.

■ A bankruptcy court is given the authority to appoint a trustee in a chapter 11 proceeding under particular circumstances described in the bankruptcy code. The statute provides that:

the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, ...; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate. . . .

11 U.S.C. § 1104(a). Thus, the two different bases for appointing a trustee are disjunctive; a court must find *either* fraud, incompetence and the like *or* that such appointment is in the interests of the creditors and estate. *Garland Corporation,* 6 B.R. at 460. Indeed, some courts have read this section of the statute as *mandating* the appointment a trustee when there are findings of the circumstances described in subsection (a)(1). *Savino Oil,* 99 B.R. at 525; *In re The Bible Speaks,* 74 B.R. 511, 512 (Bankr.D.Mass. 1987).

■ It appears, however, that the bankruptcy court in this case based its exercise of this authority on subsection (a)(2),[8] and, therefore, this Court will restrict its analysis to that provision. A court's analysis of the grounds for the appointment of a trustee

under section (a)(2) is different from that in the previous section. This "flexible standard for ... appointment," *In re Sharon Steel Corp.,* 86 B.R. 455, 457 (Bankr.W.D.Pa.1988), entails "the exercise of a spectrum of discretionary powers and equitable considerations." *In re Savino,* 99 B.R. at 525. Therefore, courts must determine on a case-by-case basis whether the circumstances of each bankruptcy requires the appointment of a trustee under subsection (a)(2). *In re Sharon Steel,* 871 F.2d at 1226.

■ Nonetheless, this Court has reviewed decisions of other courts on the appointment of chapter 11 trustees and notes that many have based the appointment of a chapter 11 trustee on subsection (a)(2) grounds for reasons which apply equally well here. Courts have noted that since the norm is for a debtor to be "in possession" during the reorganization, "a debtor-in-possession has all the rights and duties of a Trustee in a chapter 11 case." *Sharon Steel Corp.,* 86 B.R. at 457. Among those rights and duties is the "duty to protect and conserve property in its possession for the benefit of creditors." *Ionosphere Clubs,* 113 B.R. at 169. A debtor-in possession is a fiduciary of the creditors and, as a result, has an obligation to refrain "from acting in a manner which could damage the estate, or hinder a successful reorganization." *Id.*

■ As a result of this fiduciary role, "[o]ne of the most fundamental and crucial duties of a debtor-in-possession ... is to keep the Court and creditors informed about the nature, status and condition of the business undergoing reorganization.... Open, honest and straightforward disclosure to the Court and creditors is intrinsic to the entire reorganization process." *Savino Oil,* 99 B.R. at 526. *See also In re Horn and Hardart Baking Co.,* 22 B.R. 668, 670 (Bankr.E.D.Pa. 1982) (noting that one of the duties that a debtor-in-possession must fulfill is the obligation to maintain and file records and operating statements). Therefore, "[w]here ...

---

8. The court stated on the record in response to the Debtor's attorney's assertion that New England Mortgage had not demonstrated the existence of any fraud, dishonesty, or incompetence, "In the best interest of the estate, I think this is one of the easiest cases I've had to deal with that call [sic] for the appointment of a Trustee, and I have no difficulty with that." Record A, Vol. I–17 at 13.

the Debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11 trustee is required." *Savino Oil,* 99 B.R. at 526.

The record in this case presents ample evidence suggesting that the Debtor here cannot be properly entrusted with the fiduciary duties of a trustee. The bankruptcy court found the Debtor to be obstructionistic and evasive throughout the proceedings. The court was clearly frustrated that, after months of court-ordered discovery and two days of evidentiary hearings, the details of the disposition of a multi-million dollar settlement award were still hazy. The testimony at the hearing indicated that further investigation of the distribution of these funds, the manner in which preferred creditors were selected and paid, and the purchase of certain judgments by someone acting on behalf of the Debtor was required. With the prospect of the Debtor receiving another multi-million dollar settlement, the bankruptcy court could properly conclude that the cause of action needed to be placed in the hands of an individual who would not work at odds with the reorganization process at each and every turn. The bankruptcy court specifically noted the Debtor's failure to maintain financial records, or even bank accounts, which could have assisted the court in determining the origin and use of the enormous sums of money that her attorney forwarded to her from the BSSN settlement. Rec. A, Vol. I–15 at 86.

Furthermore, the evidentiary hearing raised the specter of preferential transfers to inside creditors such as Richard and Simpson and that a plan had been devised for her to settle certain claims by having Richard purchase the judgments at a discount and then waive them. It is entirely reasonable, and expected, that the bankruptcy court held serious concerns regarding whether the Debtor could be relied upon to pursue and recover any fraudulent transfers on behalf of the remaining creditors. *See Sharon Steel Corp.,* 871 F.2d at 1220–21 (noting, among reasons why the bankruptcy court's appointment of a trustee was appropriate, that the Debtor had failed to sue to recover prepetition transfers that amounted "at best to voidable prefer-

ences and at worst to fraudulent conveyances.").

While the evidence at the hearing may not have been sufficient to prove, by clear and convincing evidence, that fraud or some other section 1104(a)(1) ground actually existed, the testimony was more than adequate to demonstrate to the bankruptcy court the extent to which the Debtor's creditors cannot place confidence in her to carry out her fiduciary obligations in their interest.

Courts have also concluded that deep-seeded conflict and animosity between a debtor and its creditors provides a basis for the appointment of a trustee. *Savino Oil,* 99 B.R. at 526 at n. 11; *In re Colorado–Ute Electric Ass'n,* 120 B.R. 164, 175 (Bankr. D.Colo.1990). The Bankruptcy Court for the District of Massachusetts appointed a chapter 11 trustee in a case when it found that, "[f]riction [had] developed between the Debtor and the Creditors' Committee which threaten[ed] to engulf this estate in costly and legalistic bickering over the entire range of the reorganization process." *The Bible Speaks,* 74 B.R. at 512. It concluded, "[t]he need for a neutral party to mediate disputes between the debtor and its creditors is ground for a trustee's appointment." *Id.* at 513. The tangled history of these proceedings suggests that "friction" will continue at an unacceptable level. While some degree of antagonism and animosity between a debtor and creditors can be expected in any bankruptcy proceeding, it has reached a particular intensity here which is complicating efforts to "reorganize" the Debtor. Thus, the appointment of a trustee may be the only way that the bankruptcy court can ensure that reorganization will proceed.

The Debtor's primary argument against the appointment of a chapter 11 trustee is that such action would be harmful to the estate in its attempt to gain from its single asset, the remaining count of the state court suit against Key Bank, since the result of an appointment would be that the trustee, rather than the Debtor herself, would be substituted as the plaintiff in the state court litigation. Two of the Debtor's attorneys testified that jurors would be less sympathetic to a plaintiff who is a trustee in bankruptcy rep-

resenting a group of creditors than they would be to the actual "wronged" individual. Rec. A, Vol. I–15 at 94–96, 130–33. The Debtor also points out that the bankruptcy court entered an Order Restraining Settlement of Key Bank Suit, Restricting Release of Judgment Proceeds of Key Bank Suit to Debtor's Counsel and Denying Motion for the Appointment of an Interim Trustee, Rec. A, Vol. I–3, which protects creditors from any attempt by the Debtor to distribute future settlement funds without court involvement.

The bankruptcy court, however, was clearly reluctant to accept the Debtor's arguments regarding the adverse impact of a trustee in the Key Bank litigation.[9] The bankruptcy court noted that much of the Debtor's argument regarding whether the trustee could successfully pursue the action came by way of "veiled threats" that the Debtor and her attorneys would not participate in the case. Rec. A, Vol. I–5 at 135. This Court agrees that the Debtor's threats cannot create a basis for denying a creditor's motion to appoint a trustee. Although two witnesses testified that the appointment would hamper the Debtor's efforts at achieving a maximum recovery in the litigation, this Court does not consider this evidence to be persuasive.[10] It is difficult to determine to any great degree of certainty that appointing a trustee can be expected to have any particular effect on the prosecution of the Key Bank litigation. There are too many variables affecting the outcome, such as the strategy of opposing counsel and the degree to which the trial court will permit the appointment of a trustee to become an issue in the trial, to allow

any accurate prediction of how the result would be different with a trustee.

It can be anticipated, though, that the attorneys pursuing the case on behalf of either the trustee or the Debtor will fulfill their ethical obligations, making every effort to protect the estate's interests in the litigation to permit maximum recovery for creditors and the Debtor.[11] Notwithstanding these concerns regarding the substitution of "plaintiff" in the Key Bank litigation, the balance of interests here weighs in favor of appointing a trustee. As discussed above, the history of these proceedings indicates that any reorganization is in jeopardy if the creditors and the bankruptcy court must rely upon this Debtor to fulfill properly the fiduciary duties imposed on a debtor-in-possession in a Chapter 11 proceeding.

The Debtor also argues that the bankruptcy court here failed to properly analyze the cost/benefit ratio involved in the appointment of a trustee. A trustee can incur significant administrative costs to the estate, which should be considered when determining whether a trustee should be appointed. *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 160 (Bankr.D.Me.1982). However, the nature of the analysis required by subsection 1104(a)(2) requires that these additional costs be considered in the context of any benefits that the estate stands to gain in order to reflect the "practical reality," of whether a chapter 11 trustee is needed. *Sharon Steel Corp.*, 86 B.R. at 457. Here, the reality is that since the bankruptcy court appears to have little or no confidence in the Debtor's ability to carry out her duties and responsibilities in the chapter 11 reorganization, the

---

9. The bankruptcy court noted on the record that its only hesitation in immediately appointing a trustee was that the Debtor alleged that she was the only person who could successfully prosecute the Key Bank litigation. Record A, Vol. I–16 at 113–14. The court specifically denied making any such finding and stated, "I think I basically reject the idea." Rec. A, Vol. I–16 at 114.

10. The bankruptcy court specifically rejected the testimony of the Debtor's "experts," both of whom were her own attorneys. The court noted during a colloquy with the Debtor's counsel on the present motion:

[Y]our experts may be right, but I don't think that's the test. I really think there are differ-

ent points of view. I don't think I'm bound to accept these two opinions just because they're not contradicted by other so-called trial experts. It's their opinion. I respect it. I just don't buy it.

Rec. A, Vol. I–17 at 13.

11. For example, the attorneys can request that the trial court provide specific instructions to the jury explaining that they must assign liability and award damages, if any, without consideration of the fact that the claim is being pursued by a chapter 11 trustee on behalf of the bankruptcy estate.

"costs" to the bankruptcy estate would be far greater in the absence of a trustee.

Finally, Debtor alleges that, at most, the bankruptcy court should have appointed an examiner rather than a trustee, as is provided at section 1104(b) of Title 11. The record reflects the fact that this path was fully considered and rejected by the bankruptcy court. The court reasoned that, since it was likely that a trustee would be appointed at some point in the future and that the examiner and trustee could not be the same person, it would be more efficient and less costly simply to appoint a trustee now to commence an investigation of the BSSN funds since a trustee has the power to perform all of the functions of an examiner. Rec. A, Vol. I–17 at 6–7. This Court can find no fault with the bankruptcy court's reasoning on this issue.

The record in this case clearly substantiates the bankruptcy court's determination that a trustee is needed in this case. Accordingly, this Court cannot conclude that the findings relied upon by the bankruptcy court in its appointment of a chapter 11 trustee in this matter are clearly erroneous.

\* \* \*

As a guide for future action to *both* the trustee and the bankruptcy court in this case, this Court has noted with near incredulity the casual and ineffective nature to date of the pursuit of specific and detailed information about the distribution of several million dollars of settlement proceeds once they came into the hands of this uncooperative and self-serving Debtor. Only the lack of cogent purpose can explain the lackluster result. The Debtor, and the pursuit of information in her possession regarding the settlement funds, have been treated almost disinterestedly throughout the proceedings in the court below. The Debtor certainly possesses and apparently should disclose promptly on proper initiative information about the fate of this very significant amount of money. She has received to date undeserved "kid glove" treatment.

The Court believes that, certainly at this juncture, not only the pecuniary interests of the parties are involved in breaking down the barrier posed by the Debtor's obstructionism on the subject of "where the money went" or may still be, but that the integrity of this Court's judicial processes, as implemented through the workings of the bankruptcy court, may well be at stake. The Court believes that the chapter 11 trustee, with the full support of the bankruptcy judge, must promptly focus his attention on this case *and this serious aspect of this case.* It is respectfully suggested that the bankruptcy court should either inspire the parties adverse to the Debtor to take meaningful, aggressive, immediate, and effective action to bring the Debtor and her minions to heel in respect to disclosure or that the bankruptcy court should itself act *sua sponte,* by the exercise of its powers under Title 11 United States Code section 105, to ensure that a hearing on the subject of the disposition of the settlement proceeds is promptly commenced, at which either the trustee or the court itself will interrogate the Debtor, as well as every other person who is shown by the evidence to have had access to or to have exercised dominion over the money, including all the Debtor's various counsel. This should be done in an atmosphere that brooks no trifling obstructionism to the court's quest for the truth. It is time for this hunt to be treated seriously, doggedly, and without any dilution of purpose by strategies of legal formalism. The bankruptcy court should see to it *immediately.*

### III.  CONCLUSION

The Order Authorizing Appointment of a Chapter 11 Trustee, entered by the bankruptcy court on April 26, 1994, is hereby AFFIRMED.

So ORDERED.