In re BELLEVUE PLACE ASSOCIATES,
an Illinois general partnership,
Debtor.

Bankruptcy No. 94 B 9270.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Dated and Entered July 11, 1994,
Nunc Pro Tunc July 1, 1994.

Kathryn M. Gleason, Office of U.S. Trustee, Chicago, IL.

J. Douglas Bacon, Latham & Watkins, Chicago, IL, counsel to Twenty–One East, Inc.

David F. Heroy, Lawrence M. Benjamin and Thomas C. Wolford, Neal Gerber & Eisenberg, Chicago, IL, counsel to Meridien entities.

Steven B. Towbin, Stephen Bobo and Michael Golde, D'Ancona & Pflaum, Chicago, IL, for debtor.

Gus A. Paloian and Marie Appleby, Seyfarth Shaw Fairweather & Geraldson, Chicago, IL, for debtor estate.

James H.M. Sprayregen, David J. Zott, Wendy L. Chronister and Matthew N. Kleiman, Kirkland & Ellis, Chicago, IL, for Caisse Centrale des Banques Populaire.

## MEMORANDUM OPINION

JACK B. SCHMETTERER, Bankruptcy Judge.

FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF (I) GRANTING OF MOTION TO APPOINT CHAPTER 11 TRUSTEE PURSUANT TO SECTION 1104 AND (II) DENIAL OF DEBTOR'S APPLICATIONS TO RETAIN PROFESSIONALS

### INTRODUCTION

This matter having been tried on June 14, 1994 through June 21, 1994 upon, *inter alia*, the motion of Caisse Centrale des Banques Populaires ("CCBP") for an order appointing a chapter 11 trustee ("Trustee Motion") pursuant to § 1104 of the United States Bankruptcy Code ("Bankruptcy Code")[1] and the applications of Bellevue Place Associates ("BPA") to employ bankruptcy counsel and financial advisors pursuant to § 327(a) (collectively "Employment Applications"), and the Court, having considered the oral testimony, documentary evidence, arguments of counsel in support of their respective positions, and all pleadings and objections filed with respect thereto, now makes and enters the following Findings Of Fact and Conclusions Of Law.

### FINDINGS OF FACT

#### THE PARTIES

1. On May 9, 1994, Bellevue Place Associates ("BPA") filed a voluntary petition under chapter 11 of the Bankruptcy Code. Since the commencement of the case, BPA has been acting as a debtor in possession pursu-

1. 11 U.S.C. § 101 *et seq.* (1994). All section references are to the Bankruptcy Code unless otherwise noted.

618

ant to § 1107 and § 1108 of the Bankruptcy Code.

2. BPA is an Illinois general partnership. BPA's principal business is owning the hotel commonly known as Le Meridien Chicago, 21 East Bellevue, Chicago, Illinois.

3. BPA's administrative general partner and owner of an approximately 95% interest in BPA is Twenty–One East Inc., a Delaware corporation ("Twenty One"). See Joint Ex. 45.[2] Twenty One is a wholly owned subsidiary of MAC N.A., a Delaware corporation ("MAC").

4. BPA Limited Partnership, a Wisconsin limited partnership, owns the remaining approximately 5% general partnership interest in BPA. The general partner of this limited partnership is Rush–Bellevue Development Corporation ("RBDC"), an Illinois corporation.

5. Air France owns approximately 57.32% of the stock of Societe des Hotels Meridien ("SHM"). Air France, in turn, is owned by the State of France.

6. SHM's wholly owned subsidiary, Meridien S.A., provides management services to approximately fifty hotels with the Meridien name and owns several dozen entities in connection with these hotel operations. Meridien Hotels, Inc., a wholly owned subsidiary of Meridien S.A., ("MHI") is a management company with respect to Meridien's U.S. hotels.

7. Meridien Hotels Investments Group, Inc. ("MHIG") is a wholly owned subsidiary of SHM.

### 1990 Refinancing

8. In February 1990, CCBP loaned BPA $37,000,000 ("First Mortgage Loan") to be used to refinance a prior mortgage loan and for general operating purposes.

9. As a precondition to the First Mortgage Loan and to induce CCBP to fund the First Mortgage Loan, MHIG posted a $5,000,000 debt service guaranty ("Guaranty") secured by an irrevocable standby letter of credit in favor of CCBP.

10. Pursuant to a Cash Shortfall Agreement dated February 14, 1990, between Meridien and BPA, all amounts funded under the Guaranty were deemed as having been loaned by MHIG to BPA. Joint Ex. 53.[3] Thus, by virtue of MHIG's $5,000,000 payment to CCBP under the Guaranty, MHIG has asserted a $5,000,000 claim against the estate and holds a mortgage on the Hotel Le Meridien Chicago.

11. Simultaneous with the 1990 refinancing, BPA and Meridien entered into a management agreement ("Management Agreement") pursuant to which Meridien managed and operated the Hotel for BPA. Joint Ex. 5.

12. The original term of the Management Agreement was twenty-five years, subject to certain termination provisions. Joint Ex. 1. Section 9.1.3 of the Management Agreement, for example, imposes specific performance standards on Meridien. Under this section, in the event that Meridien failed to satisfy such performance standards and Meridien subsequently failed to pay to BPA the lesser of the gross operating profit shortfall or Meridien's management fees for the applicable period, the Management Agreement terminated. Section 9.1.4(b)(iii) provided for termination of the Management Agreement by BPA on notice in the event that Air France ceased to be the majority owner of Meridien.

### Events Leading to Foreclosure

13. On November 14, 1991, less than two years after CCBP funded the First Mortgage Loan, BPA defaulted under the loan agreement by failing to make the interest payment then due. BPA subsequently failed to make numerous interest payments due on the First Mortgage Loan.

14. On April 15, 1992, after granting BPA an initial ninety (90) day extension to cure its defaults, CCBP sent BPA a notice of default under the First Mortgage Loan. Joint Ex.

---

**2.** Collectively, the term "Meridien" refers to SHM, MHIG, MHI and MHI's parents, subsidiaries and affiliated entities.

**3.** "Joint Ex." refers to exhibits identified on the Combined Trial Exhibit List submitted jointly by all parties.

12. CCBP sent subsequent notices of default and, on December 14, 1994, CCBP notified Meridien of its intent to foreclose and inquired whether Meridien would exercise its option to purchase the outstanding indebtedness owed to CCBP. This option was memorialized in section 3(b) of a letter agreement between CCBP and Meridien executed simultaneously with the closing of the First Mortgage Loan. On December 20, 1994, Meridien indicated that it was not in a position to make any determination to exercise its option. See Joint Exs. 10, 13, 15, 16.

15. In August and September, 1993 BPA paid CCBP a total of $400,000 for past due interest. Joint Ex. 20. Over a one month period in November and December 1993, Meridien withdrew from the Hotel's operating account approximately $850,000 of previously unpaid management and marketing fees. Joint Ex. 23. BPA, subsequently paid a portion of its real estate taxes due March 1, 1994 late but that was its normal practice due to seasonal cash flow. BPA was required to borrow money to pay counsel to represent it in its 1994 workout discussions with Meridien.

16. On January 11, 1994, after attempts to achieve a consensual workout among BPA, Meridien and CCBP failed, CCBP initiated foreclosure proceedings on its mortgage in the Circuit Court of Cook County, Chancery Division.

### 1994 NEGOTIATIONS BETWEEN BPA AND MERIDIEN

17. Following the commencement of the state court foreclosure action, BPA and Meridien engaged in negotiations which culminated in the March 30, 1994 Master Agreement among BPA, its owners and shareholders, and Meridien. Joint Ex. 1.

18. Joseph A. Mawad, a representative of Twenty One (through counsel) negotiated the Master Agreement on behalf of the BPA Parties.[4]

19. Jacques Ehrmann was the primary negotiator for Meridien. Mr. Ehrmann is the executive vice president of development and legal affairs at SHM, and he is the president and chief executive officer of MHIG. In addition, Mr. Ehrmann holds approximately fifteen (15) positions as officer and/or director of various Meridien entities and has been employed by Meridien entities for ten years. As CEO of MHIG, Mr. Ehrmann has the ultimate responsibility for protecting MHIG's interests in the Hotel.

20. At trial, witnesses on behalf of Meridien and the BPA Parties testified that Meridien and the BPA Parties intend to act in accordance with the terms of the Master Agreement and regard the Master Agreement as a valid and binding agreement. While they also testified that they would perform the Master Agreement subject to their fiduciary duties to BPA, the estate and BPA's creditors, performance of all such fiduciary duties was subject to consent by Meridien officers who now control debtor BPA and therefore those witnesses could not exercise their fiduciary duties independently.

21. Latham & Watkins represented Twenty One, and MAC, in the negotiation of the Master Agreement. Proskauer Rose Goetz and Mendlesohn ("Proskauer") represented Meridien in connection with the negotiation of the Master Agreement. In late 1993 or early 1994, BPA retained Holleb & Coff to represent it in connection with BPA's restructuring or reorganization. Latham & Watkins had far more involvement in the negotiations leading up to the Master Agreement on behalf of the owners of BPA than did Holleb & Coff on behalf of BPA.

### TERMS OF MASTER AGREEMENT

#### 1. Meridien's Control Over BPA And Its Disclaimer Of Fiduciary Duties

22. The primary effect of the Master Agreement was to, among other things, transfer complete control of the workout and reorganization process of the debtor, BPA, to Meridien representatives, while at the same time stripping BPA of its ability to exercise its fiduciary and other duties of a debtor-in-possession.

4. "BPA Parties" as defined in the Master Agreement and used herein, refers collectively to BPA, Twenty One, BPA Limited Partnership, RBDC, MAC, James A. Hummert, and James D. Hummert.

23. The parties intent to vest Meridien with control over BPA is set forth in the introductory "whereas clauses" of the Master Agreement which, in relevant part, provide

> **Whereas,** ... Meridien requires that the BPA Parties give Meridien exclusive control of the [reorganization] process on the terms and conditions set forth [in the Master Agreement];
>
> **Whereas** the parties intend, acknowledge and agree that Meridien will act solely in Meridien's interests as provided herein, without regard to the interests of the BPA Parties;
>
> **Whereas** the parties do not intend that Meridien shall have any duties, fiduciary or otherwise (whether arising by law, contract or otherwise), to any BPA Party ... [5]

24. These edicts are implemented through several provisions of the Master Agreement including, among others,

- section 1.1(a) pursuant to which the BPA Parties grant Meridien "the sole right, power and authority to have exclusive control, without interference by any of the BPA Parties ... to file a petition and plan of reorganization on behalf of BPA ... and to act in the name and on behalf of BPA in such proceedings ..."

- section 1.1(b), which grants Meridien the sole discretion as to the manner of proceeding in negotiations or actions relating to a possible workout or a reorganization;

- section 1.2, pursuant to which each of BPA's stockholders collaterally assigned their shares in Twenty One and RBDC to Meridien and Meridien obtained irrevocable proxies to vote those shares;

- section 1.5, pursuant to which all members of the Boards of Directors and the officers of Twenty One and RBDC, at the closing of the Master Agreement, tendered their resignations and, in turn, were replaced by Meridien officers and/or directors ("New Directors");

- section 6.6(b), which provides that "the BPA Parties are not entitled or permitted to participate ... in the Workout

and Reorganization process or in any actions, negotiations or discussions relating thereto."

25. The Meridien representatives who became the new directors and officers of both entities (Twenty One and RBDC) that control BPA were granted "sole discretion and authority to manage the affairs and operations of BPA." Joint Ex. 1, ¶ 1.3.

26. In addition to vesting Meridien with total control over BPA, the Master Agreement authorizes Meridien to act "in accordance with what Meridien, in its sole discretion, perceives to be in Meridien's best interest and for its sole account" and that "none of Meridien ... the New Directors or the Replacement Directors shall have any fiduciary or other duty (whether arising by law, by contract or otherwise) to any BPA Party ..." Joint Ex. 1, ¶ 7.1; *accord* ¶ 10.9.

27. As consideration for entering into the Master Agreement, BPA's ultimate shareholders received $500,000 and, under sections 3.2 and 3.3, were promised an additional $1,000,000 upon the occurrence of an "Acceptable Arrangement" as defined in the Master Agreement. Such shareholders' counsel and BPA's counsel received a portion of the initial $500,000 payment. The Master Agreement's definition of "Acceptable Arrangement" includes "confirmation of a plan of Reorganization for BPA that is acquiesced in or accepted or agreed or consented to by Meridien". BPA's ultimate shareholders chose not to use, any portion of the $500,000 or any other potential resources to fund professionals for BPA in any bankruptcy case.

### 2. Retention of D'Ancona & Pflaum and Ernst & Young

28. During the Master Agreement negotiations, Meridien's counsel asserted that Meridien's counsel could represent both Meridien and BPA after the closing of the Master Agreement to carry out the transactions contemplated therein. Meridien, through Proskauer, rejected Twenty One's counsel's suggestion that Holleb & Coff, the firm originally retained by BPA, continue to represent BPA after the closing. At BPA's suggestion,

---

5. Joint Ex. 1, p. 2.

Meridien ultimately agreed that BPA should be separately represented after the closing of the Master Agreement. At that time, Meridien proposed the law firm of D'Ancona & Pflaum ("D'Ancona") to substitute for Holleb & Coff (the firm previously chosen by BPA).

29. Meridien, as part of the Master Agreement, consented to BPA continuing to retain Ernst & Young ("E & Y") as a financial adviser to BPA.

30. Meridien has agreed to advance funds to BPA "earmarked" for D'Ancona's and E & Y's retainers and subsequent professional fees and expenses. Joint Ex. 39. However, Meridien retained the right to stop advancing D'Ancona's legal fees at any time upon notice to BPA. Finally, the Master Agreement as executed grants Meridien the authority in its sole discretion to fire D'Ancona for any reason or no reason and also to terminate E & Y. BPA's counsel, Mr. Towbin of D'Ancona, acknowledged that he would need to obtain authorization from the Board of Directors of Twenty One prior to taking legal action on BPA's behalf. Each of the three members of the Board of Directors of Twenty One was nominated by Meridien and is a senior Meridien employee.

31. The Master Agreement obligates both the BPA Parties and any counsel retained by any one of the BPA Parties to deliver "[a]ll work product prepared in connection with ... a potential workout or Reorganization ..." to Meridien's counsel or to any such counsel which Meridien, in its sole discretion, may designate. Joint Ex. 1, ¶ 6.3. Section 6.3 provides, in part, that

> BPA hereby waives any and all legal conflicts involving Meridien, and agrees that Meridien shall be deemed a Partner solely for purposes of any and all attorney-client, attorney work-product, or accountant-product privileges relating to communications or work product prepared in connection with ... the potential Workout or Reorganization.

### 3. Amendments To The Management Agreement And Mutual Releases

32. The Master Agreement amended the Management Agreement in several impor-

tant respects. Joint Ex. 1. Under the Master Agreement, the term of the Management Agreement was extended by an initial period of nine (9) years; the Master Agreement also grants Meridien an automatic right to extend the Management Agreement for two additional ten year terms for a total extension of 29 years. In addition, the Master Agreement deleted from the Management Agreement the provisions imposing performance standards on Meridien and providing for its termination if Meridien failed to satisfy those standards. Finally, the Management Agreement eliminated BPA's right to terminate Meridien based upon Meridien ceasing to be an affiliate of Air France.

33. Evidence at trial demonstrated that BPA gave up potentially valuable rights as part of the amendments to the Management Agreement. At trial, BPA's witness, including its expert Daniel Wayne Daniele of E & Y, and its General Manager, Wolfgang Triebnig, testified on BPA's behalf and acknowledged that Meridien had not met certain Rev Par performance standards specified in § 9.1.3 of the Management Agreement potentially applicable for the years 1991, 1992 and 1993, and that Meridien also had not made the payments to BPA specified therein. Joint Ex. 12; CCBP Ex. 15.[6] Meridien claimed that these performance standards were unworkable and had been abandoned. Thus, according to the specific written provisions of the Management Agreement, in certain circumstances, where these performance standards were not satisfied, the Management Agreement would automatically terminate. In addition, Meridien's witnesses, including Mr. Ehrmann and Mr. Brooks, testified that Air France currently is in the process of selling its interest in Meridien. Mr. Brooks testified in his deposition, which was designated into evidence, that Mr. Ehrmann had informed Mr. Brooks that Air France might make a decision within the next 30 days. CCBP Ex. 5 at 96. Such a sale also by Air France would result in BPA's right to terminate the Management Agreement by the Management Agreement's original terms. Joint Ex. 1, ¶ 9.1.4. The evidence demon-

---

6. "CCBP Ex." refers to exhibits offered into evidence by CCBP alone.

strated that the right to terminate had significant value to whichever entity had that right. The amount of that value cannot be determined from this record.

34. Prior to entering into the Master Agreement, BPA asserted several claims against Meridien including (i) a claim for recovery of wrongfully paid management fees, (ii) mismanagement of the Hotel and (iii) claims that Meridien failed to satisfy the performance standards of Section 9.1.3 of the Management Agreement. Meridien disputed these claims and asserted defenses to them. BPA released each of these claims by the terms of the Master Agreement. Meridien likewise released any claims it may have had against BPA including the alleged failure to fund FF & E reserves and working capital.

35. On May 9, 1994, the Board of Directors of Twenty One directed BPA to commence this case. The following week, BPA sought approval of the Employment Applications pursuant to § 327(a). CCBP opposed the Employment Applications, and, in light of the facts recounted herein, moved for appointment of a trustee pursuant to § 1104 of the Bankruptcy Code.

36. On May 17, 1994, BPA filed a plan of reorganization and disclosure statement. BPA's plan provides for (a) SHM to fund the plan, subject to the future approval of its Board of Directors, (b) to pay the trade creditors in full, and (c) CCBP receiving the value of its security interest in Le Meridien Chicago Hotel plus an amount on its deficiency claim and ten (10) percent of the net proceeds of a sale or refinancing of the Hotel. The plan also provides for release of all claims against Meridien and for the assumption of the Management Agreement (subject to the future consent of MHI).

37. Mr. Towbin of D'Ancona discussed the terms of the Plan with Meridien's representatives. Certain provisions in the final version of the plan which are favorable to CCBP were the result of BPA's suggestions and proposals, including the interest rate to be paid and the payment to be received from the proceeds of a sale or refinancing.

38. At the conclusion of the trial on this matter, CCBP agreed to fund a Chapter 11 trustee pursuant to the terms set forth in the Judgment Order appointing a Chapter 11 trustee entered on this date in accordance with these Findings Of Fact and Conclusions of Law.

39. Any Findings of Fact that may be contained in the Conclusions of Law will stand as additional Findings of Fact.

### CONCLUSIONS OF LAW

### I. JURISDICTION

40. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Local Rule 2.33 referring all bankruptcy cases and proceedings to the bankruptcy court for hearing and determination. This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

### II. APPOINTMENT OF A TRUSTEE IS MANDATED BY THE FACTS OF THIS CASE

#### A. STANDARDS FOR THE APPOINTMENT OF A TRUSTEE UNDER SECTION 1104

41. Section 1104(a) of the Bankruptcy Code directs the bankruptcy court to order the appointment of a trustee

(1) for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the best interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104.

42. Determinations made pursuant to § 1104(a) of the Bankruptcy Code are fact intensive. See *In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3d Cir.1989) (section 1104(a) decisions must be made on a case by case basis). A bankruptcy court is required to order the appointment of a trustee where "cause" exists. Subsection (a)(1) identifies

examples of "cause" including fraud, dishonesty, incompetence and gross mismanagement. However, this list is nonexhaustive. See, e.g., *In re Madison Management Group, Inc.*, 137 B.R. 275, 281 (Bankr. N.D.Ill.1992) (Sonderby, J.); see also *In re V. Salvino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr.E.D.N.Y.1989) ("grounds for appointing a reorganization trustee are not even limited to the derelictions specifically enumerated"). A determination of cause, therefore, is within the discretion of the court and due consideration must be given to the various interests involved in the bankruptcy proceeding. *Id.* at 241. *Committee of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 240 (4th Cir.1987) (citing *In re General Oil Distributors, Inc.*, 42 B.R. 402 (Bankr.E.D.N.Y.1984)).

■ 43. The Court has particularly wide discretion under subsection (a)(2). Section 1104(a)(2) sets forth a flexible standard for appointment of a trustee even when no cause exists. Under this subsection, the Court is required to appoint a trustee when doing so addresses "the interests of the creditors, equity security holders and other interests of the estate." See, e.g., *Committee of Dalkon Shield Claimants.*, 828 F.2d at 240; see also *V. Salvino Oil & Heating*, 99 B.R. at 526 n. 11 ("factors constituting a basis for appointment a trustee under § 1104(a)(2) are amorphous, diverse and necessarily involve a great deal of judicial discretion"). "It seems that § 1104(a)(2) reflects 'the practical reality that a trustee is needed.'" *Id.* (citing *In re Sharon Steel Corp.*, 86 B.R. 455, 458 (Bankr. W.D.Pa.1988)).

■ 44. The appointment of a trustee is an extraordinary remedy that requires proof by clear and convincing evidence. See *Madison Management*, 137 B.R. at 280 (citing *In re Microwave Products if America, Inc.*, 102 B.R. 666, 670 (Bankr.W.D.Tenn.1989); see also *In re Cardinal Indus., Inc.*, 109 B.R. 755, 765 (Bankr.S.D.Ohio 1990); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y.1990) At the same time, "section 1104 represents a protection that the Court should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *V. Salvino Oil &*

*Heating*, 99 B.R. at 525 (debtor's prepetition conduct, postpetition nondisclosures and misrepresentations and noncompliance with statutory requirements, singularly and in the aggregate, constitute "cause" for appointment of trustee).

45. Given the facts of this case, the Court concludes that a trustee should be appointed under both prongs of 11 U.S.C. § 1104(a). CCBP has shown by clear and convincing evidence that cause exists to appoint a trustee under § 1104(a)(1) and that the appointment of a trustee is in the interests of creditors, equity holders and other interests of the estate under § 1104(a)(2).

**B. BPA's Inability to Exercise the Fiduciary Duties of a Debtor in Possession Constitutes "Cause" for Appointment of a Trustee Under Subsection 1104(a)(1)**

■ 46. CCBP has not established allegations of gross mismanagement, fraud or incompetence by the debtor in support of the Trustee Motion. Thus, none of § 1104(a)(1)'s specifically enumerated "causes" are applicable in this case. Rather, CCBP asserts that, under the terms of the Master Agreement, BPA is deprived of the ability to discharge duties, particularly its fiduciary duties, to all creditors and equity security holders as a debtor-in-possession. The Court agrees, and concludes that such inability to fulfill fiduciary duties of a debtor-in-possession is itself cause to appoint a trustee.

■ 47. The voluntary commencement of a case under chapter 11 of the Bankruptcy Code vests the debtor-in-possession with specific duties and obligations. See 11 U.S.C. §§ 1106, 1107. Chief among these, for present purposes, is that the debtor-in-possession is a *fiduciary* to all of to its creditors and equity security holders. *Id.* (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 200 n. 3, 103 S.Ct. 2309, 2311 n. 3, 76 L.Ed.2d 515 (1983) (the debtor in possession occupies the shoes of a trustee in every major way)); see also *Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir.1987) (debtor in possession or trustee must satisfy its fiducia-

ry duty to the debtor, creditors, and equity holders); *In re Grabill Corp.*, 113 B.R. 966, 969 (Bankr.N.D.Ill.1990) (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) ("A Chapter 11 debtor in possession administers the assets of the estate and any business conducted therein, as a fiduciary for both equity interests and creditors.").

■ 48. Under the Seventh Circuit's decision in *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991), the nature of the fiduciary duty owed by a debtor in possession (BPA) to its creditors is analogous to the corporate fiduciary duties owed by directors to shareholders under state law and includes the duties of care and loyalty.

■ 49. The duty of loyalty includes the duty not to engage in self-dealing. *Id.* This means that a fiduciary—the debtor-in-possession—is proscribed from acting solely in its self interest to the exclusion of the other interests which the debtor-in-possession has the fiduciary obligation to protect. The Master Agreement allows Meridien, through its control of BPA, to act solely in Meridien's self interest without resort to BPA's interest, and, thus, raises the specter of Meridien self-dealing.

50. Here, the debtor is not free to exercise it's fiduciary duties as a debtor-in-possession. As a result of the Master Agreement, the debtor in this case is under the complete control and direction of one secured creditor—Meridien. Under the terms of the Master Agreement, Meridien's control over the debtor does not compare to a bankruptcy case where a secured creditor exercises control over the debtor by, for example, restricting the use of cash collateral so as to threaten the debtor's ability to continue operating its business. Generally, in such a situation, a debtor and its counsel work for themselves and continue to make their own decisions; in contrast, in this case, BPA and its counsel cannot make independent decisions and cannot take any significant action without Meridien's permission. Indeed, the Master Agreement provides that BPA, the debtor-in-possession, is "not entitled or permitted to

participate in the.... Reorganization" process. Joint Ex. 1 ¶ 6.6(b).

51. Moreover, the parties to the Master Agreement agreed that Meridien, the party in control of the reorganization process, may act solely in its own interests without regard to the interests of BPA. Joint Ex. 1, ¶ 1.1(a), 1.5. In exercising its absolute control, Meridien has disclaimed any fiduciary duty to BPA. Joint Ex. 1, ¶ 1.2, 1.4. Here, a trustee, to fulfill a trustee's duties under the Bankruptcy Code, must consider whether to conduct investigations of Meridien, the same entity that would actually control any such investigation if BPA remained a debtor-in-possession. A trustee, for example, must evaluate whether to seek to recover management fees from Meridien, whether to pursue preference and/or fraudulent conveyance claims against Meridien and whether to assume or reject the Management Agreement and/or the Master Agreement. BPA cannot independently evaluate these issues. Finally, the integrity of the bankruptcy process cannot be preserved if the debtor is permitted to remain as a debtor-in-possession. Similarly, BPA cannot independently negotiate with any party during the remainder of the bankruptcy process or otherwise fulfill its duties under the Bankruptcy Code.

52. In sum, the Court concludes that the debtor-in-possession lacks any ability to exercise its fiduciary duties to all creditors and equity holders, which duties are imposed upon it by virtue of its status as a debtor-in-possession. This inability constitutes cause to order the appointment of a trustee pursuant to § 1104(a)(1).

C. **APPOINTMENT OF A TRUSTEE IS IN THE INTERESTS OF CREDITORS, ANY EQUITY SECURITY HOLDERS, AND OTHER INTERESTS OF THE ESTATE UNDER § 1104(A)(2)**

■ 53. The above-outlined discussion is also the basis for the appointment of a trustee under subsection 1104(a)(2). To serve the interests of creditors, equity holders, and other interests of the estate, the Bankruptcy Code imposes fiduciary duties on a debtor-in-possession. The debtor-in-possession cannot exercise such fiduciary duties in this case and, therefore, it is in the interests of creditors, equity holders and the es-

tate to appoint a trustee who can exercise such fiduciary duties.

54. Other considerations also warrant appointment of a trustee under § 1104(a)(2). On its face, the Master Agreement, and the plan of reorganization filed in connection therewith, resembles a prepackaged plan of reorganization. However, unlike a prepackaged plan of reorganization, as of the petition date, the creditor group in its entirety did not form a consensus. Rather, the debtor negotiated the Master Agreement with one creditor, Meridien, filed a chapter 11 petition, and presented the Master Agreement and the plan of reorganization to CCBP, the major creditor of the estate, as essentially, a take-it-or-fight-it filing. So long as (i) the parties to the Master Agreement act in accordance with its terms, (ii) BPA is controlled by Meridien, and (iii) there is a debtor-in-possession, this case is frozen. Given the current status and relationship of the parties vis-a-vis the Master Agreement, there is little hope for a consensual resolution of this case.[7]

55. In its present posture, this case resembles an unfreezable iceberg. In *In the Matter of Tahkenitch*, 156 B.R. 525 (Bankr. E.D.La.1993), a bankruptcy court found that the appointment of a trustee was in the interests of the estate, creditors and equity holders and therefore, appropriate under § 1104(a)(2). That decision was based on the bankruptcy court's finding that the two partners of the debtor partnership were in the midst of litigating their respective ownership rights and were deadlocked on management and control issues related to the debtor. *Id.* at 528. Without addressing the relative rights of the two owners of the debtor, the Court recognized that the course of the bankruptcy case depended on the goals and purposes of the owners of the debtor. Since one alleged owner wanted to liquidate the debtor and the other alleged owner sought continuation and rehabilitation of the business of the debtor, the case, like the present case, was frozen so long as the debtor remained a debtor-in-possession. A disinterested trust-

ee was required to unfreeze and facilitate the decision making process. *Id.*

56. This Court adopts the reasoning of the Louisiana bankruptcy court in *Tahkenitch*. Like the situation in *Tahkenitch*, a trustee is necessary to unfreeze this bankruptcy case and to permit and foster the negotiations between interested parties which generally occurs in bankruptcy cases. At the present time, the debtor is utterly controlled by Meridien. This trial itself is strong evidence that Meridien and CCBP can make no meaningful progress towards reorganization if the status quo is maintained. The appointment of a trustee is in the interests of the creditors, the equity holders, the other interests of the estate and is needed to "insulate the reorganization process from paralytic conflict." *See V. Savino*, 99 B.R. at 526 n. 11.

57. Therefore, by a separate Judgment Order, the Court will grant CCBP's Motion to Appoint Trustee and Order the Immediate Appointment of a Chapter 11 Trustee.

### III. STANDARDS FOR EMPLOYMENT OF PROFESSIONALS PURSUANT TO SECTION 327(A)

58. Section 327, through § 1107(a), of the Bankruptcy Code, governs the employment of professionals by the debtor-in-possession and authorizes the employment of professionals who are

- disinterested persons
- that do not hold or represent an interest materially adverse to the interest of the estate or of any class of creditors.

See 11 U.S.C. § 327(a). Failure to satisfy either the adverse interest prong or the not-disinterested prong renders an applicant ineligible for employment under § 327(a).

59. In conjunction with this section, professionals seeking to be employed under § 327(a) are required to file affidavits pursuant to Fed.R.Bankr.P. 2014(a) disclosing all connections with creditors, any other party in interest and their respective attorneys and

---

7. The arguments of BPA's and Meridien's counsel that the Master Agreement is only enforceable to the extent it does not violate the Bankruptcy Code are rejected in that the Master Agreement has not been amended and the parties to it testified they intend to be bound by it and to implement it.

accountants. Further, § 328(c) of the Bankruptcy Code allows the court to deny compensation to a professional in any case where "such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate," 11 U.S.C. § 328(c), and § 330 only permits a bankruptcy court to award compensation to a professional employed under § 327. See 11 U.S.C. § 330. In other words, where an attorney for a debtor is found to hold *or represent* an adverse interest, disallowance of attorney's fees is appropriate. See *In the Matter of Grabill Corp.,* 983 F.2d 773, 776 (7th Cir.1993) ("The scattered cases ... that allow a lawyer to be compensated who, lacking the requisite disinterestedness could not have been appointed, seem to us just plain wrong.")

■ 60. Courts aptly construe § 327(a) as being concerned with a professional's divided loyalties and ensuring that professionals employed by the estate have no conflicts of interests with the estate. *Id.* at 1013. The indisputable essence of § 327(a) and Fed.R.Bankr.P. 2014(a) is that an attorney for the debtor-in-possession can and must act with impartiality. The purpose of the two statutory requirements is to avoid even the appearance of a conflict, regardless of the integrity of the professional seeking to be employed. *In re Grabill Corp.,* 113 B.R. 966, 969 (Bankr.N.D.Ill.1990), *aff'd* 983 F.2d 773 (7th Cir.1993) (citing *In re Martin,* 817 F.2d 175, 181 (1st Cir.1987)).

■ 61. The responsibilities of counsel to a debtor-in-possession are much broader than those of counsel to a prepetition debtor. The fiduciary duties and obligations of a debtor in possession carry over to professionals retained by the debtor-in-possession. *Grabill,* 113 B.R. at 969 (citing cases). *Id.* at 970. Once counsel is employed, "a lawyer owes his allegiance to the entity and not to the stockholder, director, officer, employee representative or other person connected with the entity." Thus, counsel for BPA—as debtor-in-possession—owes a fiduciary duty to BPA, the entity, and must represent *BPA's* interests, *not* solely those of BPA's principals. In this case, however, the Master Agreement grants Meridien explicit and utter control over BPA; Meridien has the sole right to cause BPA to act in Meridien's own best interests without regard to the interests of BPA or its creditors. Meridien has disclaimed any fiduciary duties to BPA. Since BPA has no freedom to exercise its fiduciary duties as a debtor-in-possession, neither can BPA's counsel. Moreover, BPA's counsel must share certain of its work product with Meridien.

62. "Disinterested" is a term of art defined in a rather narrow sense under § 101 of the Bankruptcy Code. A "disinterested person" includes one who is not a creditor, not an equity security holder, not an investment banker for a security of the debtor and who has not been an investment banker for the past three years or an attorney for such an investment banker with regard to the sale of debtor's securities, and is not a director, officer or employee of the debtor or such investment banker. See 11 U.S.C. § 101(14). Finally, a disinterested person does not have any interest materially adverse to the interest of the estate for any reason. *Id.*

63. To "hold an adverse interest" has been judicially defined to mean

- to possess or assert any economic interest that would tend to value or lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or

- to possess a predisposition under circumstances that render such bias against the estate.

*In re Envirodyne Indus., Inc.,* 150 B.R. 1008, 1010 (Bankr.N.D.Ill.1993). To "represent an adverse interest means to serve as an agent or an attorney for any individual or entity holding an adverse interest." *In re Roberts,* 46 B.R. 815, 827 (Bankr.D.Utah 1985).

### D'ANCONA & PFLAUM IS NOT ELIGIBLE FOR EMPLOYMENT UNDER 327(A) BECAUSE IT REPRESENTS INTERESTS MATERIALLY ADVERSE TO THE ESTATE

■ 64. The Court concludes that the professionals BPA seeks to employ do not violate the "disinterested" prong of § 327(a). Such professionals in the Employment Appli-

cations do not hold an adverse interest to BPA and do not have a claim against BPA. Neither D'Ancona nor E & Y have an ownership interest in any entity related to BPA. Although D'Ancona is subject to the direction of BPA, D'Ancona is not Meridien.

65. Nevertheless, the Court concludes, based on the facts of this case, that D'Ancona and E & Y have serious, actual conflicts of interest in representing BPA. The Court concludes, based on the totality of the facts before it, that D'Ancona and E & Y in fact represent the interests of BPA's ultimate equity holders, now aligned with Meridien by virtue of the terms of the Master Agreement. Such a representation of interests adverse to the estate constitutes a disqualifying conflict of interest.

66. In *In re Kendavis Indus. Int'l, Inc.,* 91 B.R. 742, 754 (Bankr.N.D.Tex.1988), the court found a disqualifying conflict of interest existed where the actions of counsel for the debtor in possession were designed to further the interests of the principals of the debtor rather than the debtor-in-possession's owns interests. *Kendavis,* 91 B.R. at 755. The bankruptcy court noted that

> whenever counsel for a debtor corporation has any agreement, express or implied, with management or a director of a debtor, or with a shareholder, or with any controlling party, to protect the interest of that party, counsel holds a conflict. That conflict is actual, not potential, and it arises the date that representation commences.

Similarly, in this case, BPA's proposed professionals have no choice but to follow the dictates of Meridien, given that Meridien has sole and complete control over all actions (and inactions) of BPA.

67. In reaching these conclusions, the Court in no way questions the integrity of D'Ancona and E & Y. Nevertheless, in light of the strict application of ethical standards mandated by the Bankruptcy Code and the Findings Of Fact set-forth above, D'Ancona and E & Y cannot argue that they are not required, or at a minimum predisposed, to follow Meridien dictates, the entity in absolute control of the debtor-in-possession. D'Ancona was selected by, and D'Ancona and E & Y are compensated, directed, and sub-

ject to being funded by Meridien at any time (or not fired if the Court would block the firing).

68. The bankruptcy court in *In re Adam's Furniture Indus., Inc.,* 158 B.R. 291 (Bankr.S.D.Ga.1993) addressed a situation analogous to the facts of this case. In *Adam's Furniture,* the debtors sought to employ a law firm. The shareholder of the debtor and two related corporate entities paid the fees and expenses of the law firm. *Id.* at 299. The objecting creditor alleged that certain transfers to the shareholder and related corporate entities were preferential and/or fraudulent and should be set aside. *Id.* The bankruptcy court found that the conflicting relations between the debtor, the law firm and the shareholder of the debtor and two related corporate entities were a basis for denying the law firm's application to be employed under § 327. The court held that the disqualifying conflict was the fact that the law firm seeking to be employed was receiving its fees from the very entities against whom avoidance and recovery actions may have to be taken. *Id.* at 300. Additionally, the court found the law firm was disqualified because compensation by the related entities of the debtor predisposed the firm to act in their paying clients favor.

69. The Court adopts the reasoning of *Adam's Furniture.* In this case, while D'Ancona and E & Y are supposed to be representing the debtor-in-possession, D'Ancona's and E & Y's actions are restricted because, under the terms of the Master Agreement, D'Ancona and E & Y, indisputably can only act upon the authority of Meridien. However, to adequately represent BPA, as debtor-in-possession in this particular case under the particular facts set forth above, the debtor-in-possession, D'Ancona and E & Y must evaluate potential preference, fraudulent conveyance and other causes of action against Meridien and make various other potentially adverse decisions to Meridien. Yet, Meridien stands in the position of having sole authority over these potential actions against its own interests. Further, under the terms of the Master Agreement, D'Ancona must share its work product with Meridien as it relates to any potential workout and reorga-

nization even if that work product concerns potential actions against Meridien. BPA, as it presently stands, is not free to renegotiate the plan of reorganization and that is an additional problem with the Master Agreement.

70. In conclusion, the totality of the circumstances and the particular unique facts of this case demonstrate that, D'Ancona and E & Y cannot be retained by BPA, as debtor in possession, without representing an interest materially adverse to the estate and, thus, cannot carry out their respective fiduciary duties and other duties imposed by the Bankruptcy Code. Accordingly, by separate judgment order entered contemporaneously herewith, the Court denies the Employment Applications.

71. Any Conclusions of Law that may be contained in the findings of fact will stand as additional Conclusions of Law.

### CONCLUSION

Wherefore, the Court has separately entered orders (i) immediately appointing a chapter 11 trustee pursuant to § 1104(a)(1) and (2) and (ii) denying BPA's Employment Applications in accordance with the rulings set forth herein and stated in open court on June 22, 1994 and June 23, 1994.